**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 11, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SAFIYYAH TAHIR BATTLES,

Defendant - Appellant.

No. 13-6035

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:11-CR-00354-D-1)**

---

Bill Zuhdi, Bill Zuhdi Attorney at Law, P.C., Oklahoma City, Oklahoma, for Defendant-Appellant.

Scott E. Williams, Assistant United States Attorney (Sanford C. Coats, United States Attorney, and Steven W. Creager, Special Assistant United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

After a jury trial, Safiyyah Tahir Battles was convicted of one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of money laundering, in violation of 18 U.S.C. § 1957(a). Ms. Battles was sentenced to thirty months in

prison, followed by two years of supervised release. The district court also ordered her to make restitution to the victim of her crimes. Ms. Battles now appeals her convictions and sentence on numerous grounds. Exercising jurisdiction under 28 U.S.C. § 1291, we **dismiss in part** and **affirm in part**.

**I**

**A**

Ms. Battles is a former employee of T&T Realty, a real-estate firm owned by her mother. When she built a home in 2006 at 5404 North Lottie Avenue in Oklahoma City, Oklahoma ("the North Lottie residence"), she acted as the project's general contractor. To finance construction of the residence, Ms. Battles obtained two loans totaling $377,400 from First Security Bank.

In 2007, Ms. Battles decided to refinance the North Lottie residence. She submitted a uniform residential loan application to Saxon Mortgage, Inc. ("Saxon"), but Saxon's automated system rejected the application because her debt-to-income ratio (116%) was too high. Consequently, Ms. Battles reapplied for credit through Saxon's "Score Plus" program, which required her to submit twelve months' worth of bank statements, as well as information concerning her gross monthly income and assets. Among other things, Ms. Battles claimed a gross monthly income of $28,723.16 and a First Security Bank account containing $165,907.70. Saxon approved her application for a $500,000 loan shortly thereafter. But, as it turned out, Saxon's decision was based on a distorted

picture of Ms. Battles's financial status. Ms. Battles's 2007 federal income tax return revealed that her adjusted gross *annual* income was $14,346—a far cry from the $344,677.92 extrapolated from the figures on her loan application. Similarly, the balance in her bank account on the loan's closing day was less than $1000. It subsequently came to light that Ms. Battles had falsified bank statements to inflate her income and improve her chances of qualifying for a loan.

Before the loan proceeds were disbursed, a closing company prepared a settlement statement which specified that a local builder named Emmitt Wisby would receive $102,630.01 and Ms. Battles would receive $2000. The closing company gave Mr. Wisby's check to Ms. Battles on May 9, 2007 with the understanding that she would deliver it to Mr. Wisby. Instead, Ms. Battles immediately deposited the funds into her First Security Bank account. The check was made payable to "Emmitt Whisby" and bore what appeared to be the respective endorsements of Mr. Wisby and Ms. Battles. However, Mr. Wisby later stated under oath that he had never seen—and had certainly never signed—the check.

Ms. Battles quickly dissipated the proceeds of the loan; between May 11 and 21, 2007, she wrote checks totaling $47,700 to family members. She made no mortgage payments on the North Lottie residence after July 31, 2007. When the property fell to foreclosure at the end of 2007, the outstanding loan balance was $499,902.34. And, though Ms. Battles eventually sold the North Lottie residence

3

for $173,000, Saxon nonetheless sustained a significant loss from having funded the loan.

**B**

On November 15, 2011, a grand jury returned a three-count indictment charging Ms. Battles with (1) making a false statement to a financial institution, in violation of 18 U.S.C. § 1014 (Count I); (2) committing wire fraud, in violation of 18 U.S.C. § 1343 (Count II); and (3) laundering money, in violation of 18 U.S.C. § 1957(a) (Count III). Ms. Battles exercised her right to a jury trial, which commenced on June 14, 2012. The jury returned a verdict of guilty on Counts II and III of the indictment on June 21, 2012, but failed to reach a verdict on Count I. As a result, the district court declared a mistrial on Count I and subsequently granted the government's unopposed motion to dismiss that count without prejudice.

Following Ms. Battles's trial, a representative of the United States Probation Office prepared a Presentence Investigation Report. *See* Aplt. App., Vol. I, at 103A (Presentence Investigation Report, filed Oct. 29, 2012) [hereinafter, "PSR"].[1] The probation officer held Ms. Battles responsible for a total loss of $630,981.29 and determined that Saxon's share of that loss for the North Lottie residence was $326,902.34. The remainder of the loss was attributed

---

[1]    The Probation Office used the 2011 version of the United States Sentencing Guidelines Manual ("U.S.S.G." or "the Guidelines"), and so do we.

to loans associated with six other Oklahoma City properties. According to the probation officer, Ms. Battles had fraudulently "obtain[ed] excessive proceeds from the closing of the homes" and "either kept the proceeds . . . or funneled" them through other entities—namely, M&N Remodeling ("M&N"), a business she and her sister operated in 2005 and 2006. PSR, ¶ 12, at 6; *see, e.g.*, *id.*, ¶ 24, at 9 ("Investigators later learned that the sale price of [3128 Dentwood Terrace] was inflated in an effort to funnel the money that was to go to [M&N] for alleged repairs to [Ms.] Battles.").

Relying on U.S.S.G. § 2B1.1, and grouping Counts II and III in accordance with U.S.S.G. § 3D1.2, the probation officer set Ms. Battles's base offense level at 7 and added fourteen levels based on the total loss amount. *See* U.S.S.G. § 2B1.1(b)(1)(H) (loss between $400,000 and $1,000,000). Then, because Ms. Battles was convicted of violating 18 U.S.C. § 1957, the probation officer assessed an additional offense level. *See* U.S.S.G. § 2S1.1(b)(2)(A). Ms. Battles received no acceptance-of-responsibility adjustment. *See* PSR, ¶ 41, at 12 ("[Ms. Battles] proceeded to trial and . . . never admitted to the illegal conduct in this case."). The PSR thus assigned to Ms. Battles a total offense level of 22 and a criminal history category of I, computing an advisory Guidelines range of forty-one to fifty-one months.[2] Pursuant to the Mandatory Victims Restitution Act

---

[2] Ms. Battles's advisory Guidelines range fell well below the statutory
(continued...)

5

("MVRA"), 18 U.S.C. § 3663A, the probation officer also recommended that Ms. Battles be ordered to make restitution to "Saxon Securitization Trust 2007-3 c/o Christine Hill" in the amount of $326,902.34. PSR, ¶ 108, at 23. Ms. Battles lodged several objections to the PSR and moved for both a downward departure and a downward variance.[3]

On February 1, 2013, Ms. Battles appeared for sentencing and presented the testimony of her aunt and Federal Bureau of Investigation case agent Timothy Schmitz. She also introduced several M&N business documents in an effort to legitimize that enterprise[4] and prove that her involvement therein was not "relevant conduct" for purposes of her sentence. *See generally* U.S.S.G. § 1B1.3 (explicating the sentencing concept of "relevant conduct"). After considering the foregoing evidence, the district court denied Ms. Battles's request for a departure. However, the district court did grant a downward variance, noting that such a dispensation would "at least mitigate the impact of [Ms. Battles's] incarceration on her children" and would not otherwise contravene the sentencing goals listed

_____

[2](...continued)
maximum sentences available for her offenses of conviction: twenty years for Count II, 18 U.S.C. § 1343, and ten years for Count III, *id.* § 1957(b)(1).

[3]     Ms. Battles also filed a pro se motion for a new trial on January 8, 2013, which was ordered stricken from the record because she was represented by counsel.

[4]     A recurring theme throughout Ms. Battles's trial was that M&N was a "shell company" used to perpetrate mortgage fraud.

in 18 U.S.C. § 3553(a). Aplt. App., Vol. VI, at 1123. The district court ultimately sentenced Ms. Battles to serve thirty months in the Federal Bureau of Prisons on Counts II and III (set to run concurrently), followed by two years of supervised release. In addition, the court adopted the PSR's recommendation regarding restitution. Final judgment entered on February 1, 2013, and Ms. Battles filed her notice of appeal from this judgment on February 12, 2013.[5]

On March 22, 2013, during the pendency of this appeal, Ms. Battles moved for a new trial[6] pursuant to Federal Rule of Criminal Procedure 33. In her motion, Ms. Battles alleged that she learned from post-trial discussions with her mother "that evidence existed [that] she was not provided." *Id.*, Vol. II, at 148 (Def.'s Am. Mot. for New Trial, filed Mar. 22, 2013). More specifically, she referenced approximately 200 pages of documentary evidence subpoenaed from

---

[5] Because timing is critical to the resolution of Ms. Battles's first claim (as discussed *infra*), we find it prudent to mention that she framed her appeal as one "from the final judgment entered in this action on the 1st day of February, *2012*." *United States v. Battles*, Dist. Ct. No. 5:11-CR-00354-D-1, Doc. 163, at 1 (Notice of Appeal, filed Feb. 12, 2013) (emphasis added). The record makes clear that this aberrant date is a typographical error. *Id.*, Doc. 161, at 1 (J. in Criminal Case, filed Feb. 5, 2013) (specifying "February 1, 2013" as the "Date of Imposition of Judgment").

[6] This was the third such motion filed by Ms. Battles. The first, as noted *supra*, was ordered stricken as an improper pro se filing. The second, filed March 1, 2013, was also ordered stricken for failure to comply with the Local Rules of the Western District of Oklahoma.

7

Stephen Jones, her mother's attorney[7]: these documents consisted of (1) receipts from M&N; and (2) reports from interviews of customers of Lending Leaders, her sister's brokerage firm. Ms. Battles first came into physical possession of these documents at some point after July 12, 2012 (i.e., three weeks *after* trial) by reviewing files at Mr. Jones's office. *See United States v. Battles*, Dist. Ct. No. 5:11-CR-00354-D-1, Doc. 177-2, at 1 (Ex. 2 to Def.'s Am. Mot. for New Trial, dated July 12, 2012) (email from Mr. Jones's office authorizing file review); *see also id.*, Doc. 177-3, at 1 (Ex. 3 to Def.'s Am. Mot. for New Trial, dated July 18, 2012) (email from Ms. Battles's trial counsel claiming "no recollection of receiving any receipts of anything pertaining to [M&N] from the government"). Ms. Battles argued that the documents constituted *Brady* material[8] and that the government's failure to furnish them prior to trial infringed upon her constitutional rights.

---

[7] Mr. Jones initially represented Ms. Battles in a civil lawsuit filed by First Security Bank. *See* Aplt. App., Vol. II, at 178 (Attach. 1 to Resp. to Mot. for New Trial, dated June 25, 2009) (reflecting Mr. Jones's entry of appearance on behalf of Ms. Battles). However, he "ultimately withdrew as Ms. Battles's counsel in light of his representation of her mother, who was indicted on July 21, 2010." *Id.* at 168 (Resp. to Mot. for New Trial, filed Apr. 12, 2013).

[8] Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). A *Brady* violation occurs when "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *Hooks v. Workman*, 689 F.3d 1148, 1179 (10th Cir. 2012) (internal quotation marks omitted).

As further justification for a new trial, Ms. Battles asserted that she did not discover the identity of her victim until she examined the PSR. She noted that while "[t]he jury was told the victim was Saxon Mortgage . . . , the [PSR] identified a different victim"—Saxon Securitization Trust. Aplt. App., Vol. II, at 160. And, though she conceded that this purported new evidence was not *Brady* material, she insisted that her constitutional rights had been violated because she did not have "the opportunity to cross-examine at trial Saxon Securit[i]zation." *Id.*

In an order filed October 15, 2013, the district court rejected both of Ms. Battles's asserted grounds for relief and declined to hold an evidentiary hearing because "[her] allegations, accepted as true, [were] insufficient to warrant a new trial." Aplee. Supp. to Supp. App. at 5 (Order Den. Def.'s Am. Mot. for New Trial, filed Oct. 15, 2013). In reaching this conclusion, the court determined that the victim-identity evidence "would not have produced an acquittal of any charge," *id.*, and that none of Ms. Battles's averments regarding the M&N receipts or interview reports demonstrated the suppression of favorable, material evidence. The district court's order denying Ms. Battles's motion for a new trial is the final docket entry on the court's record.

**II**

On appeal, Ms. Battles raises seven claims: (1) the government suppressed evidence that was favorable and material to her defense; (2) the district court

9

erred by admitting testimony of a witness who intimated that Ms. Battles had destroyed documents; (3) there was insufficient evidence produced at trial to support her convictions; (4) she received ineffective assistance of trial counsel; (5) the district court erred by failing to grant a two-level sentence reduction for acceptance of responsibility; (6) the district court imposed a legally infirm restitution order; and (7) cumulative error deprived her of a fair trial and a reliable sentence. We address each of these arguments in turn, and for the reasons explicated below, dismiss in part and affirm in part.

### A

We first turn to Ms. Battles's contention that the government committed two discrete *Brady* violations. As noted *supra*, Ms. Battles offered an array of M&N receipts and invoices at her sentencing hearing in order to prove that her conduct—at least insofar as it related to M&N—was not fraudulent. Ms. Battles now claims that the government suppressed the M&N documents and that the information contained therein would have been favorable and material to her trial defense. In addition, she alleges that the government suppressed an IRS interview report in which Daphne Dukes, a former Lending Leaders customer, alluded to fraud taking place at that firm. Ms. Battles argues that this report "would have been critical" to her defense, for if she had known of its existence, she would have called Ms. Dukes as a witness at trial or used the report to impeach other witness testimony. Aplt. Opening Br. at 36.

10

The government urges us to review Ms. Battles's *Brady* claim for plain

error and takes the position that Ms. Battles has forfeited this claim.[9]

Specifically, the government contends that plain-error review is appropriate

because

> [Ms. Battles] was aware of the facts supporting her *Brady*
> contentions in mid-2012 but chose not to bring them to the
> attention of the district court until more than a month after filing
> a notice of appeal. At that point, the district court had lost
> jurisdiction to grant her motion for [a] new trial. Her tardy filing
> deprived this Court of the district court's consideration of the
> factual and legal issues surrounding her *Brady* allegations.

Aplee. Br. at 12–13 (citation omitted).

In arguing for plain-error review, the government intimates that Ms. Battles

may have had access *before* trial—i.e., "in mid-2012"—to the M&N documents

and to Lending Leaders witnesses (though not the specific interview report of Ms.

Dukes) and that the information gleaned from this access could have permitted

---

[9] Ordinarily, when a defendant forfeits a claim by failing to raise it before the district court, we apply plain-error review. *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) ("[W]e will entertain forfeited theories on appeal, but we will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result."). A defendant may obtain relief under the plain-error doctrine if he can "show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (internal quotation marks omitted).

11

Ms. Battles to raise before the district court the substance of the challenge that she presents here; yet, she delayed asserting any argument implicating *Brady* until after she filed her notice of appeal. If the government's intimations were true, its argument for plain-error review might have some arguable heft.

Because *Brady* is a trial right, at least in the sense that the materiality of any suppressed evidence is evaluated as of the time of trial, *see, e.g.*, *Browning v. Trammell*, 717 F.3d 1092, 1104 (10th Cir. 2013) ("In the *Brady* context, however, it is inappropriate to consider evidence developed post-verdict. To do otherwise would contradict Supreme Court cases applying *Brady* by analyzing how withheld evidence might have affected the jury in light of all other evidence it heard."); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995) ("The essence of the *Brady* rule is the proposition that nondisclosure of material exculpatory evidence violates a defendant's due process right to a fair trial."), if Ms. Battles had obtained the information upon which she presently grounds her *Brady* claim before the trial commenced (or, indeed, sometime before the trial ended), she would have been obliged to voice her concerns about that potentially suppressed information *then*. *Compare United States v. Warhop*, 732 F.2d 775, 777 (10th Cir. 1984) ("While we strongly disapprove of delayed disclosure of *Brady* materials, that alone is not always grounds for reversal. 'As long as ultimate disclosure is made before it is too late for the defendant[ ] to make use of any benefits of the evidence, Due Process is satisfied.'" (alteration in original)

12

(quoting *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir. 1979))), *with United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997) (holding that "revelation of exculpatory material just prior to the end of trial," which led "the defense [to] move[] to dismiss the case . . . for violating [*Brady*]," did not warrant reversal when, "[f]ollowing the recess, defense counsel extensively cross-examined [the witness possessing the purportedly exculpatory information] regarding the tardily-disclosed evidence . . . [and] used the exculpatory material to strong effect in his closing argument"). In such a circumstance, Ms. Battles's failure to expressly signal her unlawful-suppression concerns ordinarily would be deemed a forfeiture, and on appeal her *Brady* claim would be subject to plain-error review.

However, Ms. Battles vigorously contends that there is no such basis for application of plain-error review here: specifically, Ms. Battles contends that she did not possess adequate information to lodge her current *Brady* claim until *after* trial. In the context of ruling on Ms. Battles's motion for new trial, the district court did not conduct an evidentiary hearing to resolve the parties' factual dispute about when Ms. Battles acquired the information upon which she rests her *Brady* claim. In declining to do so, the district court said that it would accept Ms. Battles's factual allegations as true. It goes without saying that we are not equipped to resolve such factual disputes. Therefore, we also accept as true Ms. Battles's factual allegations about when she possessed the information upon

13

which she predicates her current *Brady* claim.

Accordingly, our focus in analyzing the question of Ms. Battles's preservation of her *Brady* claim is not the time of trial itself but, rather, the period after trial. Through that post-trial lens, it is evident that plain-error review is not appropriate here because upon learning after trial of the information upon which she rests her current *Brady* claim, Ms. Battles timely filed a motion for new trial based on newly discovered evidence. *See* Fed. R. Crim. P. 33(b)(1) (noting that a "motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty").

Ms. Battles, however, faces a problem much more severe than having to "successfully run the gauntlet created by our rigorous plain-error standard of review," *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012), because our post-trial focus has led us to seriously question whether we have jurisdiction to consider the portion of Ms. Battles's appeal relating to her *Brady* claim. It is axiomatic that we are obliged to independently inquire into the propriety of our jurisdiction. *See, e.g.*, *United States v. Torres*, 372 F.3d 1159, 1161 (10th Cir. 2004) ("Although the government has not challenged our jurisdiction to hear this appeal, 'it is the duty of the federal court to determine the matter *sua sponte*.'" (quoting *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974))); *accord Kalson v. Paterson*, 542 F.3d 281, 286 n.10 (2d Cir. 2008) ("The fact that neither party raised a jurisdictional issue on appeal is of no matter; we are

14

obligated to determine whether jurisdiction exists *nostra sponte*."); *see also*

*Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004) ("Because the question

of justiciability implicates this court's jurisdiction, even if neither party, nor the

district court, raised the issue, it is our duty to undertake an independent

examination to determine whether the dispute, as framed by the parties, presents a

justiciable controversy."). Having conducted such an inquiry, we conclude that

we do not have jurisdiction to address Ms. Battles's *Brady* claim in the context of

this appeal.

Because the timing of procedural events demonstrates the jurisdictional

Achilles's heel of Ms. Battles's *Brady* claim, we return briefly to the pertinent

procedural history. Ms. Battles filed her notice of appeal on February 12, 2013,

seeking to appeal from the district court's judgment and sentence. On March 22,

2013, she filed her motion for a new trial.[10] In that motion, for the first time, Ms.

---

[10] If Ms. Battles had filed her motion for a new trial within the fourteen-day time period prescribed for filing notices of appeal in criminal cases, the procedural landscape would have looked very different. As a result of doing so, Ms. Battles's February 12, 2013, notice of appeal would not have "become[] effective," Fed. R. App. P. 4(b)(3)(B), until after "the entry of the order disposing" of the motion for new trial, *id.* § 4(b)(3)(B)(i); that notice of appeal would have been "effective—without amendment—to appeal from," *id.* § 4(b)(3)(C), the district court's motion-for-new-trial order. *See Trenkler v. United States*, 268 F.3d 16, 21 (1st Cir. 2001) ("Rule 4(b) thus effectively incorporates Rule 33 motions into the process of direct appeal, but *only when* they are filed within [the rule-prescribed period to appeal from] entry of the judgment of conviction. The lack of any analogous provisions to so incorporate motions based on newly discovered evidence and filed outside the [rule's] period strongly

(continued...)

15

Battles asserted a *Brady* violation. On July 23, 2013, while awaiting the district court's ruling on that motion, she filed her opening brief—raising, in substance, the same *Brady* claim in our court.

When the district court denied Ms. Battles's motion for a new trial on October 15, 2013, it properly noted that even if relief on the motion were warranted, the court would not be situated to grant it, unless Ms. Battles sought, and then we granted, a remand. *See* Fed. R. Crim. P. 33(b)(1); *see also United States v. Varah*, 952 F.2d 1181, 1182 (10th Cir. 1991) (per curiam) (establishing that after an appeal has been filed, the district court may either deny a Rule 33 motion on the merits "or certify to the court of appeals its intention to grant the motion"); *United States v. Palmer*, 766 F.2d 1441, 1445 (10th Cir. 1985) (noting that "Rule 33 only deprives the district court of jurisdiction to *grant* a motion for a new trial during the pendency of an appeal"). Nevertheless, the court proceeded to evaluate the merits of Ms. Battles's *Brady* claim, and it concluded that the claim did not provide a basis for a new trial.

The written order denying Ms. Battles's motion for a new trial constituted a final decision which adjudicated Ms. Battles's *Brady* claim. Significantly, apart from this order, there was no other district court ruling on Ms. Battles's *Brady*

---

[10](...continued)
suggests that such motions are *not* properly considered part of the direct appeal." (emphasis added)); *accord United States v. Salem*, 578 F.3d 682, 685 n.2 (7th Cir. 2009).

16

claim. Thus, the denial of her new-trial motion is the only order that could serve as a predicate for our review of Ms. Battles's *Brady* claim. Yet, Ms. Battles did not file a formal notice of appeal in the district court to challenge the court's motion-for-new-trial ruling within the fourteen-day time frame prescribed by Federal Rule of Appellate Procedure 4(b)(1)(A). *Cf.* Fed. R. App. P. 3(a)(1) ("An appeal permitted by law as of right from a district court to a court of appeals may be taken *only* by filing a notice of appeal with the district clerk within the time allowed by Rule 4." (emphasis added)); *Garcia v. Regents of Univ. of Cal.*, 737 F.2d 889, 890 (10th Cir. 1984) (per curiam) ("If the trial court denies the motion for new trial, it can do so without a remand from this court and *appeal may be taken therefrom* and consolidated with the original appeal if still pending." (emphasis added)). Nor did Ms. Battles file any other document in the district court or in this court within that fourteen-day time frame that could be construed as the functional equivalent of a notice of appeal. *See, e.g.*, *Smith v. Barry*, 502 U.S. 244, 248–49 (1992) ("If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal."); *accord Nolan v. U.S. Dep't of Justice*, 973 F.2d 843, 846 (10th Cir. 1992); *Dupree v. United Parcel Serv., Inc.*, 956 F.2d 219, 220 n.1 (10th Cir. 1992).

To be sure, Ms. Battles did file a notice of appeal in this case, and, as the Supreme Court instructs, "[t]he filing of a notice of appeal is an event of jurisdictional significance [that] confers jurisdiction on the court of appeals and

17

divests the district court of its control *over those aspects of the case involved in the appeal.*"  *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam) (emphasis added); *see* 16A Charles A. Wright et al., *Federal Practice and Procedure* § 3949.1, at 51 (4th ed. 2008) ("The key point is that once jurisdiction passes to the court of appeals, the district court generally lacks power to act with respect to matters encompassed within the appeal . . . ." (footnote omitted)).  But the problem for Ms. Battles is that the district court's ruling on the motion for a new trial was never involved in—i.e., within the scope of—her notice of appeal.

By its terms, that notice evinced Ms. Battles's objection to "the final judgment entered . . . on the 1st day of February, 201[3]."  *United States v. Battles*, Dist. Ct. No. 5:11-CR-00354-D-1, Doc. 163, at 1.  As such, within the scope of that notice were all matters related to Ms. Battles's conviction and sentence that occurred *prior* to the entry of the judgment.  *See, e.g.*, *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1104 (10th Cir. 2002) ("[W]e have held that a notice of appeal which names the final judgment is sufficient to support review of all earlier orders that merge in the final judgment."); *accord Montgomery v. City of Ardmore*, 365 F.3d 926, 934 (10th Cir. 2004); *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1262 (10th Cir. 2003).  However, as we know, the district court's motion-for-new-trial order—which adjudicated Ms. Battles's *Brady* claim—was filed over eight months *after* entry of

18

the judgment. Therefore, we could hardly conclude that Ms. Battles's notice of appeal attacking the district court's February 1, 2013, judgment included within its scope that court's subsequently filed motion-for-new-trial order, which did not actually exist at the time the judgment was entered.[11]

Similarly, "[a]lthough an appellate brief may serve as a functional equivalent of a notice of appeal" under certain circumstances, *Nolan*, 973 F.2d at 846, and Ms. Battles's opening brief did ostensibly present her *Brady* claim to our court, it could not serve as the functional equivalent of a notice of appeal from the district court's motion-for-new-trial ruling (which adjudicated Ms. Battles's *Brady* claim). Most saliently, that brief could not do so because it did not "designate" the district court's motion-for-new-trial order as the order challenged.

---

[11] After oral argument, Ms. Battles filed a notice of supplemental authority to support her view that "Appellant's Motion for New Trial and the district court's denial of the motion (as recognized by the government in the Motion to Supplement and the order granting the Motion to Supplement) has caused her New Trial Motion to become a collateral part of her direct appeal." *United States v. Battles*, No. 13-6035, Supp. Letter, at 2 (10th Cir., filed Jan. 30, 2014). For this proposition, she relies upon *LeBere v. Abbott*, 732 F.3d 1224 (10th Cir. 2013). Ms. Battles urges that *LeBere* controls because "while his direct appeal was pending, LeBere filed a motion for new trial which became a collateral part of his direct appeal." Supp. Letter, *supra*, at 2. Ms. Battles's reliance on *LeBere*, however, is misplaced. First, the *LeBere* case itself did not involve Mr. LeBere's direct appeal; the case was a habeas proceeding in which Mr. LeBere collaterally attacked his state-court judgment. Second, in the passage of *LeBere* which forms the basis for Ms. Battles's argument, we were discussing the operation of *state* law (as opposed to federal law) as it relates to motions for new trial and direct appeals. *See* 732 F.3d at 1230–31 (discussing Colorado's procedural bar). For both of these reasons, *LeBere* is irrelevant to the determination of Ms. Battles's federal direct appeal.

19

Fed. R. App. P. 3(c)(1)(B) (noting that a "notice of appeal must . . . designate the judgment, order, or part thereof being appealed"); *see Smith*, 502 U.S. at 249 ("They [i.e., the federal rules] do not preclude an appellate court from treating a filing styled as a brief as a notice of appeal, however, *if* the filing is timely under Rule 4 and *conveys the information required by Rule 3(c)*." (emphases added)). Indeed, it would not have been possible for Ms. Battles to designate the district court's motion-for-new-trial order in her opening brief, because on the date she filed her brief—July 23, 2013—the district court's motion-for-new-trial order had not been issued. *Cf. Laurino v. Tate*, 220 F.3d 1213, 1219 (10th Cir. 2000) (concluding that we lacked jurisdiction over the district court's amended judgment granting sanctions because "[a]t the time the notice of appeal in this case was filed, . . . defendants' motion seeking to amend the judgment to award Rule 11 sanctions to them had been filed but not decided" and, after the motion was decided, the litigant suffering the sanctions "failed to file an amended notice of appeal from the district court's amended judgment"). Ms. Battles could hardly have sought our appellate review of a district court order that did not exist. *Cf. McClendon v. City of Albuquerque*, 630 F.3d 1288, 1292 (10th Cir. 2011) ("When it comes to *when* federal appellate courts may take a case, Congress has said that we may usually hear appeals only from 'final decisions of the district courts of the United States.'" (quoting 28 U.S.C. § 1291)).

In sum, the sole district court order that adjudicated Ms. Battles's *Brady*

20

claim was the order denying Ms. Battles's motion for a new trial. This order was issued *after* the district court's final judgment was entered and *after* Ms. Battles filed her formal notice of appeal challenging that judgment (i.e., challenging her conviction and sentence). We can find no evidence in the record that, after the district court issued its motion-for-new-trial order, Ms. Battles sought within the fourteen-day period prescribed by the federal rules to file a new notice of appeal to challenge that order.

Furthermore, we conclude that Ms. Battles's formal notice of appeal (filed on February 12, 2013) cannot be construed to include within its scope the district court's motion-for-new-trial order (subsequently filed on October 15, 2013), *and* we conclude that Ms. Battles's opening brief purporting to present her *Brady* claim *before* the district court issued its motion-for-new-trial order does not constitute the functional equivalent of a notice of appeal from that order. Accordingly, we conclude that there is no jurisdictional basis for us to review the portion of Ms. Battles's appeal relating to her *Brady* claim—that is, we lack jurisdiction over that portion of her appeal.

We find support for our conclusion in the Seventh Circuit's analysis in *United States v. Harvey*, 959 F.2d 1371 (7th Cir. 1992). *Harvey*'s procedural circumstances are on all fours with Ms. Battles's: the defendant filed a Rule 33 motion "[s]ometime after" filing his timely notice of appeal and subsequently sought to attack the district court's denial of that motion on direct appeal. 959

F.2d at 1377. However (and, for our purposes, most notably), he never filed an independent notice of appeal *from that decision*. The Seventh Circuit determined that the defendant's procedural choice divested it of jurisdiction to review any claim raised in the Rule 33 motion, holding that

> [w]hen a district court denies a motion for new trial while an appeal from the underlying judgment is pending, a separate, timely notice of appeal "is a jurisdictional predicate to appellate review" of the denial of the new trial motion. Because Harvey never filed a notice of appeal from the district court's decision to deny his new trial motion, we have no power to review that decision.

*Id.* (citation omitted) (quoting *United States v. Douglas*, 874 F.2d 1145, 1162 (7th Cir. 1989)); *accord Salem*, 578 F.3d at 685 n.2.

The reasoning of *Harvey* is cogent and applicable here.[12] Ms. Battles could not rest her assertion of our jurisdiction over her *Brady* claim on her notice of

---

[12] We also find both informative and persuasive the related analyses of several of our sister circuits. *See Johnson v. United States*, 246 F.3d 655, 659 (6th Cir. 2001) ("[I]f a Rule 33 motion based on new evidence is filed later than [the rule-prescribed period] after the entry of the judgment, a defendant wishing to appeal the denial of the Rule 33 motion must file a second notice of appeal, even if the first appeal of right is still pending."); *see also United States v. Ronda*, 455 F.3d 1273, 1304 n.43 (11th Cir. 2006) ("[A]t the time Appellants sought relief under *Blakely*, they had already filed notices of appeal of their convictions and sentences. As such, the district court did not have jurisdiction to consider *those issues* . . . ." (emphasis added)); *United States v. Casas*, 999 F.2d 1225, 1231–32 (8th Cir. 1993) (accepting the government's argument that "[the] notice of appeal serves only to preserve the defendants' right to appeal their convictions and sentences" and concluding that "[b]ecause defendants failed to file a notice of appeal from the [post-conviction, post-sentencing] forfeiture judgments, we have no jurisdiction to consider their challenges to those judgments").

22

appeal from the criminal judgment filed on February 12, 2013, because the sole

order that the district court issued adjudicating her *Brady* claim was the court's

motion-for-new-trial order, which was issued over eight months after Ms. Battles

filed her notice of appeal. As in *Harvey*, Ms. Battles had to undertake an

independent and distinct appellate response within the fourteen-day time frame

prescribed in the federal rules to this motion-for-new-trial order, by filing a

separate notice of appeal from that final decision.[13] Alas, for Ms. Battles, she

---

[13] We acknowledge that some of our sister circuits have not gone the direction of *Harvey* and have concluded that a second notice of appeal is not required from a district court's denial of a motion for a new trial. The Ninth Circuit reached this conclusion without providing any meaningful analysis. *See United States v. Davis*, 960 F.2d 820, 824 (9th Cir. 1992). The Fifth Circuit relied in part on the fact that the appellant's opening brief—which addressed the district court's denial of the motion for new trial—could be deemed the functional equivalent of a notice of appeal. *See United States v. Burns*, 668 F.2d 855, 858 (5th Cir. 1982). We, of course, have expressly determined that Ms. Battles's opening brief could not be viewed as the functional equivalent of a notice of appeal. Therefore, this "functional-equivalent" rationale of the Fifth Circuit is inapposite. To be sure, along with the Third Circuit, *see United States v. Thornton*, 1 F.3d 149, 157–58 (3d Cir. 1993), the Fifth Circuit in *Burns* has reasoned that no second appeal from the denial of a motion for new trial should be required where the parties have "thoroughly briefed" the motion-for-new-trial issues and there has been no "showing of prejudice against the government," *Burns*, 668 F.3d at 858; *see also United States v. Wilson*, 894 F.2d 1245, 1252 (11th Cir. 1990) ("Because the government was not prejudiced in this case by [defendants'] failure to file a separate notice of appeal from the district court's denial of their new trial motion, they may also challenge the district court's post-trial rulings on appeal."). However, we decline to follow these courts that rely upon adequate briefing and the absence of a showing of prejudice. The reasoning of *Harvey* comports well with the approach that we have taken in the civil context regarding an analogous situation—*viz.*, a district court ruling on a discrete issue while the original appeal was pending. *See Laurino*, 220 F.3d at 1219.

(continued...)

23

failed to do so.

For the foregoing reasons, then, we conclude that there is no jurisdictional

basis for us to review the portion of Ms. Battles's appeal relating to her *Brady*

claim—*viz.*, we lack jurisdiction over that portion of her appeal. Therefore, we

---

[13](...continued)

Furthermore, in a per curiam opinion, we endeavored in *Garcia* "to set forth definitively the proper procedures to be followed in both civil and criminal cases when a party whose appeal is pending seeks to raise issues appropriately first raised by a Rule 60(b) motion as well as under Rule 33." 737 F.2d at 890. And, regarding the criminal context, we concluded that "[i]f the trial court denies the motion for a new trial, it can do so without a remand from this court, and appeal may be taken from the denial of that motion and consolidated with this case currently pending before this court." *Id.* Although the *Garcia* court did not elaborate on this procedural proposition, the plain terms of the opinion clearly seemed to contemplate that there would be a discrete, separate appeal regarding the motion-for-new-trial issue that would be consolidated with the previously filed appeal in the case. *Cf. Webster's Third New International Dictionary* 484 (2002) (defining "consolidate" to mean, *inter alia*, "to join in or cause to proceed as a single action—used of causes of action or of *actions started separately*" (emphasis added)). Lastly, even if our precedent did not clearly lead us to endorse *Harvey*'s approach, we would be disinclined to allow the propriety of our exercise of jurisdiction over a district court's motion-for-new-trial ruling to turn on factors as variable as the quality of the parties' briefing or the adequacy of the government's showing of prejudice in a given case. Our exercise of jurisdiction in such circumstances would almost ineluctably become uncertain and lacking in uniformity. *See Co. X v. United States* (*In re Grand Jury Proceedings*), 835 F.2d 237, 239 (10th Cir. 1987) (per curiam) ("[I]n matters relating to appellate jurisdiction, bright line rules are highly desirable."); *cf. Houston v. Lack*, 487 U.S. 266, 275 (1988) ("Because reference to prison mail logs will generally be a straightforward inquiry, making filing turn on the date the *pro se* prisoner delivers the notice [of appeal] to prison authorities for mailing is a bright-line rule, not an uncertain one."). Accordingly, we endorse here the approach of the Seventh Circuit in *Harvey*.

are constrained to dismiss that aspect of her appeal.[14]

**B**

Next, we address Ms. Battles's contention that the district court erred in its treatment of evidence subject to Federal Rule of Evidence 404(b).[15] We generally review such a challenge for an abuse of discretion, *United States v. Morris*, 287 F.3d 985, 989–90 (10th Cir. 2002), and will not reverse on this basis as long as the district court's decision "falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical," *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) (alteration omitted) (quoting *United States v. Shumway*, 112 F.3d 1413, 1419 (10th Cir. 1997)) (internal quotation marks omitted). However, in light of Ms. Battles's failure to "offer[ ] up a timely and specific trial objection" to the evidence, we review her claim for plain error. *United States v. McGlothlin*, 705 F.3d 1254, 1260 (10th Cir.), *cert. denied*, --- U.S. ----, 133 S. Ct. 2406 (2013); *see supra* note 9 (outlining the elements of the plain-error standard).

Ms. Battles argues that certain "other-crimes" testimony was offered not for

---

[14]    On January 21, 2014, prior to oral argument, Ms. Battles filed a motion with this court to supplement the record on appeal to include two documents that she deemed relevant to the determination of her *Brady* claim. In light of our disposition of this claim, we **deny** this motion as moot.

[15]    This rule forbids the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

25

any of Rule 404(b)'s recognized purposes[16] but, rather, to incite the jury's passions against her.  Specifically, she objects to statements made by government witness Brenda Seals-Hopkins, a former employee of both T&T Realty and Lending Leaders.  During direct examination, Ms. Seals-Hopkins confirmed that these companies occupied adjacent offices in the same building.  At that point, the government asked Ms. Seals-Hopkins whether she could "recall a situation in which it appeared that documents had been burned inside that building."  Aplt. App., Vol. IV, at 592.  She answered affirmatively.  While unable to pinpoint a date or time, Ms. Seals-Hopkins described a morning when she noticed smoke coming from a trash can and that "the only person that was over there at that time was Ms. Battles."  *Id.*  According to Ms. Battles, this testimony was outcome-determinative—i.e., but for Ms. Seals-Hopkins's statements, the jury would not have returned a guilty verdict on Counts II or III.

It is undisputed that neither of the government's two notices of intent to introduce Rule 404(b) material indicated that a witness might testify about Ms. Battles destroying evidence.[17]  However, even if we assume *arguendo* that the

---

[16]     Rule 404(b) evidence is regularly admitted (but not exclusively so) to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

[17]     Indeed, the government contends that the evidence did not constitute Rule 404(b) evidence at all because it was not extrinsic evidence.  That is, the government submits that Ms. Seals-Hopkins's testimony was intrinsic evidence for the wire-fraud charge, opining that Ms. Battles's alleged attempt to destroy

(continued...)

26

district court erred, and clearly and obviously so, in not recognizing this evidence as improper 404(b) evidence and taking appropriate remedial action—for example, issuing curative instructions—Ms. Battles cannot satisfy the third prong of our plain-error test. In other words, Ms. Battles has not "demonstrate[d] that the error affected [her] substantial rights, i.e., that the error disturbed the outcome of the district court proceedings." *United States v. Frost*, 684 F.3d 963, 971 (10th Cir. 2012) (internal quotation marks omitted).

The evidence against Ms. Battles was *easily* sufficient to sustain her convictions of wire fraud and money laundering. Out of four days' worth of extensive testimony, Ms. Seals-Hopkins's allegedly "improper" contribution (i.e., her "other-crimes" statements) was her brief answers to *two questions*. We are confident that any impact her statements might have had on the jury was negligible. In that regard, we note that the government did not put her answers

---

[17](...continued)
documents was connected to her scheme to defraud Saxon. "We have held that other act evidence is intrinsic—and thus not subject to Rule 404(b)—when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) (alteration omitted) (quoting *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993)) (internal quotation marks omitted). We are not convinced that the challenged evidence can fairly be called "intrinsic" to the fraud charge, especially given Ms. Seals-Hopkins's inability to pinpoint the date. We have no need, however, to definitively opine on the point—as Ms. Battles's challenge fails in any event. We are content to proceed on the assumption that the evidence was in fact extrinsic.

27

before the jury again, in closing argument or otherwise. Moreover, the district court specifically instructed the jury that, "[o]f course, the fact that the defendant may have previously committed" a prior bad act "[did] not mean that she necessarily committed the acts charged in this case." Aplee. App., Vol. I, at 36. "It is presumed that jurors will conscientiously observe the instructions and admonitions of the court." *United States v. Greer*, 620 F.2d 1383, 1390 (10th Cir. 1980); *see, e.g.*, *United States v. [Mark] Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992) ("We presume jurors will remain true to their oath and conscientiously follow the trial court's instructions.").

In sum, we find it implausible that Ms. Seals-Hopkins's statements were "so powerful . . . [that] *as a result Ms. Battles was convicted* of two counts." Aplt. Reply Br. at 10 (emphasis added). Put another way, Ms. Battles cannot survive the third step of the plain-error test: any error occasioned by the admission of Ms. Seals-Hopkins's challenged testimony did not affect Ms. Battles's substantial rights. Consequently, such error does not justify reversal of Ms. Battles's convictions.

## C

### 1

Ms. Battles's third challenge concerns whether sufficient evidence was produced at trial to sustain her convictions of wire fraud and money laundering. We review this claim de novo, "asking only whether taking the evidence—both

28

direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Bader*, 678 F.3d 858, 873 (10th Cir.) (alteration omitted) (quoting *United States v. McCane*, 573 F.3d 1037, 1046 (10th Cir. 2009)) (internal quotation marks omitted), *cert. denied*, --- U.S. ----, 133 S. Ct. 355 (2012). In our sufficiency assessment, we make no determinations regarding witness credibility or the weight to give conflicting evidence. *See United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008). Even so, "we will not uphold a conviction justified solely by 'piling inference upon inference,'" *id.* (quoting *United States v. Jameson*, 478 F.3d 1204, 1208 (10th Cir. 2007)), or one obtained by evidence that "raises no more than a mere suspicion of guilt," *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000) (internal quotation marks omitted).

## 2

Conviction under 18 U.S.C. § 1343 "requires (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme." *United States v. Ransom*, 642 F.3d 1285, 1289 (10th Cir. 2011) (quoting *United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008)) (internal quotation marks omitted). Where, as here, the defendant is charged with perpetrating "a scheme to obtain money by false

29

pretenses, representations or promises," the "focus[ ]. . . [is] on the means by which the money is obtained[,] and particular false pretenses, representations or promises must be proved." *Gallant*, 537 F.3d at 1228 (quoting *United States v. Cochran*, 109 F.3d 660, 664 (10th Cir. 1997)) (internal quotation marks omitted). Ms. Battles maintains that her conviction for wire fraud cannot stand because "[the fact that] the transfer was part of an illegal scheme on [her] part was not proven sufficiently." Aplt. Opening Br. at 64.

Ms. Battles suggests that her wire-fraud conviction must be reversed because the jury did not find her guilty on Count I (making false statements to a bank). She avers that despite the government's introduction of her federal income tax returns to demonstrate that she obtained the $500,000 loan by fraud, the jury did not specifically convict her of submitting a fraudulent tax document to a bank. Nonetheless, it is well-settled in our circuit that "an inconsistent verdict is not a sufficient reason for setting a verdict aside." *United States v. Irvin*, 682 F.3d 1254, 1271 (10th Cir. 2012); *see United States v. Harris*, 369 F.3d 1157, 1168 (10th Cir. 2004). This is so, we have held, because the most that can be said about inconsistent verdicts is that "either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *United States v. McCullough*, 457 F.3d 1150, 1162 n.2 (10th Cir. 2006) (quoting *United States v. Powell*, 469 U.S. 57, 64–65 (1984)) (internal quotation marks omitted).

30

Alternatively, Ms. Battles insists she was convicted of wire fraud because the jury heard Ms. Seals-Hopkins's purported improper testimony, as well as evidence that Ms. Battles was diverting the loan proceeds to others. As to Ms. Seals-Hopkins's testimony, we already have noted that any error associated with its admission was harmless and did not affect Ms. Battles's substantial rights. In any event, in assessing the merits of Ms. Battles's sufficiency challenge, we are obliged not to speculate about the weight the jury accorded to any particular piece of evidence. *See Bowen*, 527 F.3d at 1076.

More to the point, as the government notes, there was ample evidence to support its wire-fraud case against Ms. Battles. For instance, the jury learned about Ms. Battles's real-estate background and, as such, could reasonably have inferred that she understood the process of loan procurement. More specifically, the jury could easily have concluded that Ms. Battles knew that a borrower with regard to a $500,000 loan had to possess an income significantly higher than the income that the evidence attributed to Ms. Battles. *See* Aplt. App., Vol. V, at 928–29 (testimony of Ms. Battles's sister acknowledging that someone with considerable debt would need an income above $100,000—perhaps even $200,000—to qualify for a loan of that magnitude). The jury also saw false representations of Ms. Battles's gross income—namely, a value on her Saxon loan application that overstated her true annual income by at least $300,000—and evidence of her high debt-to-income ratio, which thwarted her first attempt to

31

obtain a loan. Moreover, the jury heard testimony indicating that this was not the first time Ms. Battles had drawn a hazy picture of her finances. *See, e.g.*, *id.*, Vol. III, at 546–47 (suggesting that Ms. Battles did not disclose that her bank account was a joint account, which would have affected the loan decision for a different mortgage); *id.* at 560–61 (indicating that she did not report a commission Lending Leaders earned for brokering a loan); *id.*, Vol. V, at 922–24 (intimating that she had falsely represented Lending Leaders's role in certain transactions).

Crucially, the evidence also indicated that Ms. Battles was not forthright about the disbursement of the loan proceeds. Her Saxon loan-approval commitment document clearly limited the amount that she could receive at closing to the lesser of "2% of [the] loan amount or [$2000]" and directed her to "provide . . . builder payoff" documentation. Aplee. App., Vol. II, at 324–25 (capitalization omitted). To that end, Ms. Battles's sister alluded to Ms. Battles's concern "about Saxon needing documentation for where . . . $100,000 [of the loan] was going" and confirmed that "the documentation that Saxon got [was] Government's Exhibit 208." Aplt. App., Vol. V, at 941–43. The referenced exhibit was a letter purporting to "serve as a payoff" for $105,000—on letterhead bearing the words "*Whisby* Homes By Emmitt *Wisby*." Aplee. App., Vol. II, at 322 (emphases added). The contradictory spellings noted in italics—of "Whisby" and "Wisby"—could have supported a reasonable jury's inference (when viewed

32

in light of the totality of the evidence) that the document labeled as Exhibit 208 had been fabricated.  Such an inference would have been reinforced by the testimony of Mr. Wisby, who indicated that he did business as "Emmitt R. Wisby and Son Construction Company," Aplt. App., Vol. IV, at 603–04—not "Whisby Homes."  In any event, the jury certainly knew Saxon's position that Ms. Battles should not receive over $100,000 of the loan proceeds.  *See id.*, Vol. III, at 420 ("[H]ad we known that $105,000 was going to the borrower, it would have made the loan ineligible for approval.").  The jury likewise knew that, nevertheless, Ms. Battles *did* receive these funds when she accepted the check on Mr. Wisby's behalf and deposited it into her own bank account instead of remitting it to his business.

All told, we are satisfied that a substantial quantum of evidence supported Ms. Battles's wire-fraud conviction.  Accordingly, under our deferential standard of review, we will not second-guess the jury's decision to find Ms. Battles guilty of wire fraud.

**3**

To convict Ms. Battles of money laundering, the jury was required to find beyond a reasonable doubt that "(1) [she] engaged in or attempted to engage in a monetary transaction; (2) in criminally derived property worth at least $10,000; (3) with knowledge that the property was derived from unlawful activity; and (4) the property was, in fact, derived from specified unlawful activity." *Irvin*, 682

33

F.3d at 1270. The money-laundering statute provides that "any property constituting, or derived from, proceeds obtained from a criminal offense" is "criminally derived property," 18 U.S.C. § 1957(f)(2) (internal quotation marks omitted), and that the requisite knowledge is that the property was derived from "*some* form . . . of activity that constitutes a felony"—regardless of whether that activity is expressly listed in the statute, *id.* § 1956(c)(1) (emphasis added).

"The government need not meticulously trace the funds involved in a monetary transaction offense or prove that the funds could not have come from a legitimate source." *United States v. Dazey*, 403 F.3d 1147, 1163 (10th Cir. 2005); *see United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992) ("The government had the burden of showing that the criminally derived property used in the monetary transactions was in fact derived from specified unlawful activity. This does not mean, however, that the government had to show that funds withdrawn from the defendant's account could not possibly have come from any source other than the unlawful activity."). The government is not obliged in a § 1957 prosecution to "prove that no 'untainted' funds were deposited along with the unlawful proceeds." *Johnson*, 971 F.2d at 570; *see also United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000) ("Obviously, when tainted money is mingled with untainted money in a bank account, there is no longer any way to distinguish the tainted from the untainted because money is fungible.").

Here, it is beyond cavil that sufficient evidence supported the money-

34

laundering conviction. The basis of the money-laundering charge was a $15,000 check that Ms. Battles wrote to her mother on May 11, 2007. The check was drawn on Ms. Battles's account at First Security Bank and was written only two days after Ms. Battles deposited $102,430.01 into that account (that is, a May 9 deposit). The government introduced ample evidence from which a rational factfinder could infer that the $102,430.01 deposited into her account was the proceeds of wire fraud: in brief, the closing company had received almost $496,000 via interstate wire on May 9; pursuant to the settlement statement showing a payment due in the precise amount of $102,630.01 to a business operated by Mr. Wisby, on the same day, the closing company provided Ms. Battles with a check for that amount; in turn, Ms. Battles deposited that check on the same day into her account at First Security Bank and kept $200 in cash, and Mr. Wisby testified that he never received the funds and never endorsed the check.

At the time that Ms. Battles made the $102,430.01 deposit, there was less than one hundred dollars in the account—specifically, the balance on May 8 was $64.45. And, according to the bank statement for that account, for the period beginning May 8 and ending May 18, there were no other deposits to the account. Therefore, a rational factfinder would have had little difficulty concluding that, when Ms. Battles wrote the $15,000 check to her mother on May 11, the debit that she effected involved fraudulently obtained funds and Ms. Battles knew that fact.

35

*See United States v. Haddad*, 462 F.3d 783, 792 (7th Cir. 2006) (holding that the evidence of § 1957 money laundering was sufficient where "the government proved aggregate withdrawals of far more than $10,000 above the amount of clean funds available; the vast majority of funds transferred to the [defendant's] business account from the food stamp reimbursements were not supported by evidence of legitimate food sales"); *Dazey*, 403 F.3d at 1163 (concluding that the evidence of § 1957 money laundering was sufficient where "the government provided evidence that [Defendant] knew that the funds in the First Lenape Nation account came primarily from investors, and that he knew that those funds were fraudulently obtained" and thus the evidence "was sufficient to support an inference that [Defendant] had the requisite knowledge that the money from the checks came from illegal activity"); *cf. United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001) ("[W]here an account contains clean funds sufficient to cover a withdrawal, the Government [cannot] prove beyond a reasonable doubt that the withdrawal contained dirty money.").

Notwithstanding this mountain of evidence, Ms. Battles disputes that the funds came from criminal activity, alluding to the remarks of a First Security Bank employee who "testified that he had seen [her] making money on flipping houses." Aplt. Opening Br. at 66. This argument is off-point; the referenced individual was discussing bank deposits made in 2005, roughly eighteen months *before* Ms. Battles wrote the check in question. In other words, the testimony

36

does not cast doubt on the sufficiency of the evidence supporting this conviction. Accordingly, we conclude that Ms. Battles's sufficiency-of-the-evidence challenge to the money-laundering count fails.

**D**

We turn now to Ms. Battles's contention that she received ineffective assistance of trial counsel because her attorney did not engage in plea negotiations or request a mistrial after Ms. Seals-Hopkins's above-discussed allegedly improper testimony. Ineffective-assistance-of-trial-counsel claims on direct appeal are generally disfavored in this circuit. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc) ("reaffirm[ing]" that "[i]neffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal"). When these claims are brought on direct appeal, "they 'are presumptively dismissible, and virtually all will be dismissed.'" *United States v. Flood*, 635 F.3d 1255, 1260 (10th Cir. 2011) (quoting *Galloway*, 56 F.3d at 1240). The reason for this approach is to ensure that "a factual record enabling effective appellate review may be developed in the district court." *United States v. Hamilton*, 510 F.3d 1209, 1213 (10th Cir. 2007). Our court recognizes a narrow exception to this principle "only where the issue was raised before and ruled upon by the district court *and* a sufficient factual record exists." *Flood*, 635 F.3d at 1260; *see also United States v. Edgar*, 348 F.3d 867, 869 (10th

37

Cir. 2003) (noting that dismissal in favor of collateral proceedings is presumed "even when the issues on direct appeal are sufficiently developed for us to pass judgment").

Under the circumstances of this case, we believe the prudent course is to withhold consideration of Ms. Battles's ineffective-assistance claim. Ms. Battles acknowledges that the ineffective-assistance issue was not raised or ruled on in the district court. Moreover, we would be hard-pressed to conclude that the record before the district court was sufficiently developed to address *this* issue.[18] *See Massaro v. United States*, 538 U.S. 500, 505 (2003) (instructing that "a trial record not developed *precisely for the object of litigating or preserving the claim*" is "inadequate for this purpose" (emphasis added)). Our holding in *Galloway* consequently militates in favor of dismissing this claim without prejudice so that the district court may address it in collateral proceedings in the first instance. *See* 56 F.3d at 1240 ("Even if evidence is not necessary, at the very least counsel accused of deficient performance can explain their reasoning and actions, and the district court can render its opinion on the merits of the claim.").

---

[18] Although the district court conducted post-trial proceedings, it did so regarding another matter (i.e., the *Brady* claim)—not to resolve whether Ms. Battles's trial counsel rendered ineffective assistance.

38

**E**

Ms. Battles next argues that the district court erred by failing to adjust her sentence for her alleged acceptance of responsibility. Ms. Battles bore the burden of proving her entitlement to an acceptance-of-responsibility adjustment by a preponderance of the evidence. *See United States v. Benoit*, 713 F.3d 1, 24 (10th Cir. 2013). Guidelines § 3E1.1(a) permits a two-level sentencing reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for [her] offense." U.S.S.G. § 3E1.1(a).

As stated in the application notes to the 2011 edition of the Guidelines, because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," we owe the district court's determination "great deference." *Id.* § 3E1.1 cmt. n.5. We will therefore reverse on this basis only for clear error, *see United States v. Melot*, 732 F.3d 1234, 1243–44 (10th Cir. 2013), which means that "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed," *United States v. Weed*, 389 F.3d 1060, 1071 (10th Cir. 2004) (quoting *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998)) (internal quotation marks omitted).

First, Ms. Battles claims that a § 3E1.1 reduction was appropriate because she *did* accept responsibility for her crimes. The district court concluded otherwise at sentencing, observing that, "[i]n fact, she blamed much of the

underlying conduct on others . . . [and did not] fall[] in the category of the rare case in which a defendant challenges all the government's allegations at trial and then also deserves an acceptance of responsibility credit." Aplt. App., Vol. VI, at 1088–89.

More specifically, the court did not accept Ms. Battles's argument that her participation in a Rule 11 interview constituted "accepting responsibility." Nor do we. In our view, Ms. Battles's reported Rule 11 statements—viewed collectively—are one of many indicia of her apparent strategy of contesting the factual element of intent. *See id.*, Vol. I, at 136–39 (denying that she knew who furnished the altered bank statements, that she owed Mr. Wisby money, and that she signed Mr. Wisby's name on the loan check). Indeed, we would have great difficulty viewing Ms. Battles's Rule 11 statements as not reflecting in pronounced fashion her denial of fraudulent intent in connection with the Saxon loan. And this denial continued throughout her trial and sentencing.[19] *See, e.g.*, *id.*, Vol. VI, at 986 (counsel's statement to the jury that "circumstantial evidence . . . says that Ms. Battles did not have any intent to scheme or defraud

---

[19] Ms. Battles's comments at sentencing likely did little to help her cause. Before the district court pronounced sentence, Ms. Battles made several statements that did not even come close to evincing a proper acceptance of responsibility. *See* Aplt. App., Vol. VI, at 1113–19 (professing, "I don't even know what I really could have done"; "I discussed the check with Mr. Wisby"; "Mr. Wisby endorsed the check, gave it back to me"; and "I'm here today for my recordkeeping . . . . [T]hat's pretty much the gist of my actions.").

40

[Saxon]").

Further, Ms. Battles seizes upon the district court's allusion to Application Note 2 to § 3E1.1—i.e., that "[i]n rare situations a defendant may clearly demonstrate an acceptance of responsibility" even after proceeding to trial. U.S.S.G. § 3E1.1 cmt. n.2. Not surprisingly, she cites to our holding in *United States v. Gauvin*, 173 F.3d 798 (10th Cir. 1999), the only precedential decision in which we have *upheld* an acceptance-of-responsibility adjustment when the defendant put the government to its proof. Our recent clarification of the content and scope of *Gauvin*, however, demonstrates that it offers Ms. Battles no succor. The "rare situation" where a defendant goes to trial but nonetheless receives a § 3E1.1 adjustment does not contemplate a defendant's challenge to the factual element of intent. *See United States v. Herriman*, 739 F.3d 1250, 1257–58 (10th Cir. 2014); *see also Melot*, 732 F.3d at 1244; *McGehee*, 672 F.3d at 877–78. Because she has not demonstrated that she "*only* disputed purely legal questions in going to trial," *see Herriman*, 739 F.3d at 1257, Ms. Battles's circumstances fit the "rule" rather than the "exception" (i.e., *Gauvin*) for this reduction.

Next, Ms. Battles suggests that she deserves the § 3E1.1 adjustment because the government "vindictively" never offered a plea bargain, thereby forcing her to go to trial. Proving vindictive prosecution requires a showing of actual vindictive conduct or, at a bare minimum, "a realistic likelihood of

41

vindictiveness" that can support "a presumption of vindictiveness." *United States v. Wall*, 37 F.3d 1443, 1447 (10th Cir. 1994) (internal quotation marks omitted); *accord United States v. Begay*, 602 F.3d 1150, 1155 (10th Cir. 2010). The government must justify its decision not to extend a plea offer only if Ms. Battles meets this initial burden; this she cannot do. *See Wall*, 37 F.3d at 1447.

As best we can tell, Ms. Battles believes she has stated a "reasonable likelihood of vindictiveness" because she participated in a Rule 11 interview *and*, in a different criminal proceeding—also involving wire fraud and money laundering—her mother received a plea offer. But she misinterprets our circuit's view of "vindictiveness"; that is, we look for evidence of "hostility or punitive animus toward the defendant because [she] exercised [a] specific legal right." *United States v. [Israel] Carter*, 130 F.3d 1432, 1443 (10th Cir. 1997) (internal quotation marks omitted). There is absolutely no evidence of such conduct on this record. The government was entitled to consider plea bargaining as a wasted effort and proceed to trial, *see Weatherford v. Bursey*, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."), and Ms. Battles offers no authority to the contrary.

There is no "reasonable likelihood" that the government has acted vindictively when a pre-trial decision results from "the prosecutor's normal assessment of the societal interest in prosecution." *United States v. Goodwin*, 457

42

U.S. 368, 380 n.11 (1982).  Given Ms. Battles's refusal to admit to anything more

innocuous than signing loan documents, it was perfectly reasonable for the

government to determine that going to trial was a suitable allocation of resources.

In sum, for the foregoing reasons, we conclude that Ms. Battles has failed to

demonstrate that the district court abused its discretion in denying her an

acceptance-of-responsibility downward adjustment under U.S.S.G. § 3E1.1.

## F

Turning to another aspect of her sentence, Ms. Battles challenges the

legality of the restitution order directing her to pay $326,902.34 to "Saxon

Securitization Trust 2007-3."  More specifically, she argues that, for purposes of

restitution, "the victim identified to the jury at trial was not the same victim

identified after trial."  Aplt. Opening Br. at 60 (capitalization omitted).  We reject

Ms. Battles's hypertechnical argument to this effect.

The MVRA requires "the sentencing court [to] order a defendant convicted

of a felony through fraud or deceit to pay restitution to the victims of [her] illegal

conduct."  *United States v. Parker*, 553 F.3d 1309, 1323 (10th Cir. 2009); *see* 18

U.S.C. § 3663A(a)(1) ("[T]he court *shall* order . . . that the defendant make

restitution to the victim . . . ." (emphasis added)).  The statute defines a victim as

any person "directly and proximately harmed as a result of the commission of an

offense for which restitution may be ordered including, in the case of an offense

43

that involves as an element a scheme, . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme . . . ." 18 U.S.C. § 3663A(a)(2). Restitution must be made "in the full amount of each victim's losses as determined by the court." *United States v. Kieffer*, 681 F.3d 1143, 1171 (10th Cir. 2012) (internal quotation marks omitted), *cert. denied*, --- U.S. ----, 133 S. Ct. 996 (2013). We review the legality of a restitution order de novo, *United States v. Quarrell*, 310 F.3d 664, 676 (10th Cir. 2002), which involves reviewing the underlying factual findings for clear error and the amount of restitution imposed for an abuse of discretion, *United States v. Bowling*, 619 F.3d 1175, 1187 (10th Cir. 2010).

On appeal, Ms. Battles asserts her view that she was unfairly surprised at sentencing when the district court named a different victim in the restitution order than that identified at trial and, consequently, her Fifth Amendment due-process rights and her Sixth Amendment confrontation rights were violated. Specifically, Ms. Battles points to Deutsche Bank as the tardily disclosed victim.[20] She hooks

---

[20]    In contrast, in the context of her motion for a new trial, the district court addressed Ms. Battles's claim that "she discovered only upon receipt of the [PSR] that the fraud victim was not the entity stated in the Indictment and identified at trial, Saxon Mortgage, but another entity, Saxon Securitizat[io]n Trust 2007-3." Aplee. Supp. to Supp. App. at 3. Ms. Battles maintained then, as she does now, that her constitutional due-process and witness-confrontation rights were violated by what she evidently considers an unfair surprise. The district court was not persuaded; it concluded that even if Ms. Battles was unaware that Saxon had securitized her loan and transferred it to a trust bearing the same name,

(continued...)

her argument on an "Assignment of Security Interest"—executed on May 4, 2007, to memorialize the fact that before the North Lottie residence fell to foreclosure, the mortgage encumbering it was transferred to Deutsche Bank. The district court reviewed this document at sentencing and found it pellucid that "Deutsche Bank was taking an assignment as a trustee and custodian for Saxon" *and* that there was no "issue . . . with respect to the identification of the victim."[21] Aplt. App., Vol. VI, at 1080. We discern no error, and certainly no clear error, in this factual finding. Even assuming *arguendo* that Ms. Battles did not know Deutsche Bank had taken an assignment in May 2007, she was undisputedly on notice by the end of the year, when Deutsche Bank filed a foreclosure petition for the North Lottie residence "as trustee and custodian by" Saxon. *See United States v. Battles*, Dist. Ct. No. 5:11-CR-00354-D-1, Doc. 181-6, at 1 (Pet., dated Dec. 17, 2007) (capitalization omitted). We therefore find it unlikely that Ms. Battles remained ignorant of *some* nexus between Deutsche Bank and Saxon until the time of her trial and sentencing. Accordingly, Ms. Battles cannot establish any unfair

---

[20](...continued)
she had not alleged an actionable violation of the Fifth or Sixth Amendment. *See id.* at 5 ("Defendant concedes she has no legal authority for her contention that nondisclosure of the ultimate victim of her fraud violated a constitutional right.").

[21]     We note in passing that we *have* recognized assignees as victims entitled to restitution. *See United States v. Haddock*, 50 F.3d 835, 841 (10th Cir. 1995) ("[T]he [defrauded bank's] assets were apparently acquired by CNB. . . . We are persuaded that CNB can properly receive the restitution payments since it acquired the claims of the defunct Bank . . . ." (citations omitted)).

45

surprise that would support her constitutional claims.[22]

We further conclude that, even if Ms. Battles truly discovered the victim's identity at sentencing, she has not demonstrated *reversible* error in the form of a Fifth Amendment due-process violation. Due process in non-capital sentencing proceedings requires, *inter alia*, that the defendant's punishment stem from correct facts. *See United States v. Jones*, 640 F.2d 284, 286 (10th Cir. 1981) ("recogniz[ing] a due process right to be sentenced only on information which is accurate," but clarifying that "[t]he trial court is allowed to consider all relevant facts when sentencing a defendant"). Nonetheless, a sentence will pass constitutional muster so long as the district court's procedure would *generally* yield accurate results. *See United States v. Sunrhodes*, 831 F.2d 1537, 1542 (10th Cir. 1987) (citing *United States ex rel. Villa v. Fairman*, 810 F.2d 715, 718 (7th Cir. 1987), to support the proposition that sentencing procedures must be "good enough to produce accurate decisions over the run of cases" (internal quotation marks omitted)). The procedure leading to Ms. Battles's sentence clearly satisfies

---

[22] In a single sentence of her opening brief, Ms. Battles suggests that "[a]nother loan company, Ocwen Loan Servicing, *may have been* the alleged victim." Aplt. Opening Br. at 61 (emphasis added). The portion of the record that Ms. Battles cites offers absolutely no support for this noncommittal assertion; it merely mentions through the argument of Ms. Battles's counsel that Ocwen "sent" subpoenaed records "to the lawyers for Deutsche Bank." Aplt. App., Vol. VI, at 1076. We deem any argument concerning the purported victim status of Ocwen to be "waived on account of [Ms. Battles's] utter failure to explain or in any way substantiate [her] allegations, including with citation to legal authority." *Bader*, 678 F.3d at 894.

that standard. Ms. Battles received notice of the factual basis for the restitution order (i.e., loss amount and identity of any victims) through the PSR. She also received an opportunity to contest those allegations, which she exercised at sentencing by introducing exhibits and witness testimony.[23] No more was necessary to satisfy the Fifth Amendment. *See United States v. Hood*, 615 F.3d 1293, 1304 (10th Cir. 2010) (upholding a sentence where the defendant received "sufficient notice" of relevant evidence "as well as an opportunity to be heard").

Ms. Battles also has failed to advance a cognizable Sixth Amendment violation. We understand the Supreme Court to have "made clear that the constitutional requirements mandated in a criminal trial as to confrontation and cross-examination do not apply at non-capital sentencing proceedings." *United States v. Bustamante*, 454 F.3d 1200, 1202 (10th Cir. 2006) (internal quotation marks omitted). Along those lines, we have historically viewed "[t]he right to confrontation [as] basically a trial right," which has "[led] us to conclude that a defendant at a restitution hearing has no absolute right to confront witnesses." *Sunrhodes*, 831 F.2d at 1543; *see United States v. Grissom*, 44 F.3d 1507, 1514 (10th Cir. 1995) ("Restitution functions as a component of the sentencing process."). Therefore, Ms. Battles's claim that she was entitled to impeach the testimony of a Saxon employee who testified that Saxon was the victim is

---

[23]    Agent Schmitz's testimony was offered as part of Ms. Battles's strand of reasoning that Deutsche Bank, not Saxon, was the victim.

meritless.

Finally, Ms. Battles does not substantiate her view that insufficient evidence was adduced to support the amount of restitution. The district court followed our circuit's "net loss" method: it "subtract[ed] the sales price" of the home ($173,000) "from the outstanding balance on the loan" ($499,902.34) to arrive at an award of $326,902.34. *United States v. Washington*, 634 F.3d 1180, 1184 (10th Cir. 2011). This clear adherence to our case precedent suggests no abuse of discretion. Accordingly, and for the reasons discussed above, we affirm the district court's restitution order.

## G

As her final argument, Ms. Battles maintains that, even if this court deems each of the alleged errors harmless, these deficiencies collectively constitute reversible error. In a cumulative-error analysis, we "aggregate[] all errors found to be harmless and 'analyze[] whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002) (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc)). Thus, the defendant must prove that "multiple non-reversible errors" infected her trial. *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007). "This court considers whether the defendant's substantial rights were affected by the

48

cumulative effect of the harmless errors." *Toles*, 297 F.3d at 972. Additionally, if any errors to be aggregated are constitutional errors, the government "bears the burden of proving that [the] constitutional error[s] [were] harmless beyond a reasonable doubt." *Rivera*, 900 F.2d at 1470 n.5 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Ms. Battles has identified only one *potential* error: the district court's treatment of Ms. Seals-Hopkins's document-burning testimony. As discussed above, in the absence of notice of the government's intent to introduce this evidence, the district court *might* have erred by admitting the remarks or failing to take remedial steps, such as issuing a contemporaneous curative instruction. There being at most one error, however, we need not (and, indeed, cannot) conduct a cumulative-error analysis, as Ms. Battles requests. A defendant who "has failed to establish the existence of multiple non-reversible errors . . . cannot benefit from the cumulative error doctrine." *United States v. Lopez-Medina*, 596 F.3d 716, 741 (10th Cir. 2010) (quoting *Barrett*, 496 F.3d at 1121) (internal quotation marks omitted). Accordingly, Ms. Battles's cumulative-error claim fails.

## III

We uphold the judgment of the district court and **affirm** Ms. Battles's convictions and sentence. We **dismiss** the portion of Ms. Battles's appeal

pertaining to her *Brady* claim for lack of jurisdiction.