**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 13, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL C. REDIFER,

    Defendant - Appellant.

No. 14-3031
(D.C. No. 2:12-CR-20003-CM-10)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

A jury convicted Michael C. Redifer of one count of conspiracy to possess

with intent to distribute and to distribute 50 grams or more of methamphetamine.

*See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2. The district court

sentenced him to 360 months' imprisonment followed by a five-year term of

supervised release. On appeal, he asserts numerous errors at his trial and sentencing.

We affirm his conviction, but remand for resentencing.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The second superseding indictment in this case charged fifteen defendants, including Mr. Redifer, with participation in the methamphetamine conspiracy. Many of the conspirators reached plea agreements with the government and testified against Mr. Redifer and his co-defendant, Steven M. Hohn, at trial. The testimony of these co-defendants, along with that of law enforcement officers who investigated Mr. Redifer's activities, detailed his participation in the charged conspiracy.

The jury convicted Mr. Redifer on the conspiracy count. We previously affirmed Mr. Hohn's conviction and sentence. *See United States v. Hohn*, 606 F. App'x 902 (10th Cir. 2015). To the extent Mr. Redifer raises issues previously disposed of in *Hohn*, we affirm for substantially the reasons stated in our previous decision.[1]

Appointed counsel filed an opening brief on behalf of Mr. Redifer. We granted counsel's motion to withdraw and permitted Mr. Redifer to file a supplemental, pro se brief. In this decision, we address the issues presented in both the counseled and pro se briefing.

## ALLEGED TRIAL ERRORS

### I. Sufficiency of the Evidence/Variance From the Indictment

Mr. Redifer first argues that there was insufficient evidence to convict him of the charged conspiracy because "[t]he evidence did not support a *shared*, single

---

[1] These issues include: (1) denial of a mistrial based on testimony concerning the Kingdom City shooting, *see Hohn*, 606 F. App'x at 907-08; (2) denial of Proposed Jury Instruction No. 4, *see id.* at 910; and (3) sufficiency of the evidence that the methamphetamine was imported, *see id.* at 911.

2

criminal objective or a common, illicit goal." Aplt. Opening Br. at 11.  In a related

argument, he contends he "did not receive a fair trial because there were multiple

separate conspiracies and evidence about the dates and amount of drugs charged

varied from the indictment." *Id.* at 15.

 "We review a sufficiency of the evidence challenge de novo." *United States

v. Rodebaugh*, 798 F.3d 1281, 1296 (10th Cir. 2015).  "Under the

sufficiency-of-the-evidence test, we view the evidence in the light most favorable to

the government and ask whether the evidence—and any reasonable inferences to be

drawn from it—would allow a reasonable jury to find the defendant guilty beyond a

reasonable doubt." *United States v. Gallegos*, 784 F.3d 1356, 1359 (10th Cir. 2015).

> To support [Mr. Redifer's] conspiracy conviction, the government was
> required to prove [he] (1) agreed with at least one other person to violate
> the law, (2) knew of the conspiracy's objectives, and (3) knowingly and
> voluntarily involved [him]self in the conspiracy. The government also was
> required to demonstrate (4) interdependence among the co-conspirators.

*Id.* at 1360.  To satisfy the requirement of interdependence, "[t]he alleged

co-conspirators must have a shared, single criminal objective, not just have similar or

parallel objectives between similarly situated people." *United States v.

Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir. 2011) (internal quotation marks

omitted).

Mr. Redifer argues that the government failed to prove the charged conspiracy

because the evidence at trial revealed the conspirators had no common objective and

no common, illicit goal.  He contends that at times some of the conspirators

exchanged only personal-use quantities, and at other times some of them only sold

3

methamphetamine to support their own drug habits rather than to make a profit. But an identical profit motive is not essential to a conspiracy, because "[t]he goals of all the participants need not be congruent for a single conspiracy to exist, *so long as their goals are not at cross purposes*." *United States v. Harrison*, 942 F.2d 751, 756 (10th Cir. 1991) (internal quotation marks omitted). A reasonable jury could have found that the participants here had congruent, if not identical goals, involving the distribution of methamphetamine to make money. Whether some of the conspirators used that money to live on or to purchase methamphetamine for personal use is irrelevant. Further, the fact that the conspirators had their own customers, benefitted separately from their own drug sales, or did not pool the money they received from drug sales did not prevent them from "act[ing] together for their shared mutual benefit within the scope of the conspiracy charged." *United States v. Heckard*, 238 F.3d 1222, 1231 (10th Cir. 2001) (internal quotation marks omitted) (italics omitted).

Mr. Redifer also argues that there were fatal variances between the conspiracy charged and the proof at trial. "A variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies." *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008). "In the context of a conspiracy conviction, we treat a variance claim as a challenge to the sufficiency of the evidence establishing that each defendant was a member of the same conspiracy." *Gallegos*, 784 F.3d at 1362. "Whether sufficient

4

evidence was presented to establish a single conspiracy is a question of fact for the jury to decide." *Acosta-Gallardo*, 656 F.3d at 1124.

Where the government has charged a defendant with participation in a larger conspiracy but the evidence instead establishes several smaller conspiracies, a defendant is entitled to reversal only if the variance prejudices his substantial rights. A variance prejudices a defendant's substantial rights "if the evidence adduced against co-conspirators involved in separate conspiracies was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt." *Carnagie*, 533 F.3d at 1241. In determining whether prejudice has been shown, we consider (1) "whether the proliferation of separate crimes or conspiracies presented in the case impaired the jury's ability to segregate each individual conspirator's actions and the evidence associated with . . . his participation," (2) "whether confusion among members of the jury concerning the legal limitations on the use of certain evidence resulted from the variance," and (3) "the strength or weakness of the evidence underlying the jury's conviction." *Id.* (brackets and internal quotation marks omitted).

Even if the evidence showed the existence of multiple conspiracies, Mr. Redifer fails to establish prejudice requiring reversal of his conviction. Any evidence of separate conspiracies was unlikely to have impaired the jury's ability to segregate Mr. Redifer's actions and participation in the conspiracy to distribute and to possess with intent to distribute methamphetamine as charged in the indictment. The evidence of his participation was properly admitted and any limitations

5

concerning its use in connection with the charged conspiracy were unlikely to have confused the jury. Finally, the evidence amply demonstrated the existence of the charged conspiracy and Mr. Redifer's participation in it. He has failed to demonstrate reversible error due to the alleged variance.[2]

## II. Admission of Prior State Conviction

Mr. Redifer filed a pretrial motion in limine to exclude any mention of his Kansas state conviction for possession with intent to sell methamphetamine and possession of marijuana. The district court denied his motion, finding that the evidence of the arrest and conviction was relevant and that its probative value was not substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403.

The jury heard the following testimony involving the prior conviction. Kerry Randall, one of the conspirators in this case, called Mr. Redifer on April 24, 2011, asking him to help move a trailer out of Mr. Randall's storage unit. During their conversation, Mr. Redifer asked Mr. Randall if he had any methamphetamine. Mr. Randall said he had "some to get rid of" and told Mr. Redifer that "you can make a little money and I can also make some money." R., Vol. 2 at 1900.

---

[2] Mr. Redifer also complains that evidence of "the dates of the offense and the amount of drugs allegedly distributed presents a highly prejudicial variance from the offense as charged." Aplt. Opening Br. at 13. The indictment charged a conspiracy involving 50 grams or more of methamphetamine. The government proved many times over that the conspirators, including Mr. Redifer personally, distributed greater quantities than the minimum 50 grams specified. As to the dates involved, the indictment stated that they were only "approximate and inclusive," *Second Superseding Indictment* dated 5/22/2012, R., Vol. 1, docket number 84, at 1, and Mr. Redifer fails to show that he was prejudiced by any variance, particularly given the evidence of his personal participation at both the beginning of the alleged conspiracy, and later, toward its end.

6

Later that day, Mr. Randall and his wife met Mr. Redifer at the storage unit, where Mr. Randall provided Mr. Redifer with around a quarter ounce to a half ounce of methamphetamine. At some point, Mr. and Ms. Randall engaged in an argument at the storage locker, which escalated into Mr. Randall beating Ms. Randall. The couple then left in Mr. Randall's truck. Mr. Redifer remained at the storage unit.

That afternoon a police officer met with Ms. Randall. She informed the officer that Mr. Redifer had witnessed the beating. The officer went to the storage unit, where she observed Mr. Redifer's truck and then encountered Mr. Redifer.

While verifying Mr. Redifer's identification, the officer walked around to the driver's side of his truck. After spotting what she believed was marijuana, she searched the truck and found three bags of white crystal meth, several glass pipes, a marijuana pipe, two scales, and additional individual plastic baggies. In addition to these drug-related items, she found a bullet behind the driver's side seat, and a rifle bullet in the driver's door pocket. Mr. Redifer later pleaded guilty in state court to the drug offenses.

This court reviews the district court's evidentiary rulings for an abuse of discretion. *United States v. Hill*, 786 F.3d 1254, 1273 (10th Cir. 2015). The district court did not abuse its discretion in admitting this evidence. The incident and resulting conviction occurred during the time period of the conspiracy. It involved the co-conspirators and the drug charged in the conspiracy count, methamphetamine. The probative value of the evidence substantially outweighed the danger of unfair prejudice from admission of the evidence.

7

In his pro se brief, Mr. Redifer asserts additional challenges to the admission of this evidence. He argues that Mr. Randall committed perjury by testifying that Mike Roark provided the methamphetamine that Mr. Randall in turn provided to Mr. Redifer. But any inconsistencies in how Mr. Randall obtained the methamphetamine go to the weight of Mr. Randall's testimony, and not its admissibility. The jury heard all of the testimony and could draw its own conclusions.

Mr. Redifer also argues that by admitting evidence of the prior conviction in his conspiracy trial, the district court subjected him to double jeopardy. This argument is meritless. *See United States v. Felix*, 503 U.S. 378, 389 (1992). ("[A] substantive crime and a conspiracy to commit that crime are not the same offense for double jeopardy purposes." (internal quotation marks omitted)).

### III. Admission of Photos of Conspirators Holding Guns

Mr. Redifer challenges the admission at trial of a photograph showing himself and co-conspirators Mr. Hohn, Mr. Quick, and Mr. Randall, sitting on the couch holding guns. The district court admitted the photo at trial, after initially granting a motion in limine to exclude it.[3]

---

[3] Although the district court admitted only one of three photos, it appears to have been presented to the jury in two different formats, as exhibits #124 (a photo download from a cell phone recovered from the residence at 809 S. Cedar in Gardner, Kansas), and #138 (a photo recovered from Mr. Quick's Sony digital camera). The photo is sometimes referred to in the singular in the relevant pleadings, and sometimes in the plural.

In her opening statement at trial, Mr. Redifer's counsel argued that there was no evidence that Mr. Redifer was involved with the conspirators the police targeted during their investigation. R., Vol. 2 at 608 ("[T]here's no evidence that Mr. Redifer was involved with any of these individuals at that time."). Based on this argument, the government sought reconsideration of the motion in limine excluding the photograph, reasoning that it would show Mr. Redifer's close association with his co-conspirators. The district court reconsidered its earlier ruling and admitted the photo, finding that it was relevant because it was physical evidence linking the co-conspirators.

Mr. Redifer argues that the district court's rationale for admitting this evidence is flawed because: (1) his counsel admitted during her opening argument that the parties knew of and were involved with each other, and merely denied that their association constituted a "conspiracy"; and (2) the jury was informed that counsel's argument was not evidence. Mr. Redifer also argues that in view of the other evidence these individuals knew each other, this evidence was not needed, and the photo was highly prejudicial.

The photo was certainly prejudicial—given the firearms shown in it—but it was also highly probative. It was taken during the course of the conspiracy and showed a close association between the conspirators. The district court did not abuse its discretion in admitting the photo.

9

### IV. Testimony Contrary to In Limine Orders

#### A. The Kingdom City Shooting

The district court granted a motion in limine to exclude evidence of a shooting incident in Missouri that involved certain of Mr. Redifer's co-conspirators. At trial, when discussing the contents of a notebook found in her bedroom, a government witness made an incidental reference to the shooting. The district court denied the defendants' motion for a mistrial based on the reference. Mr. Redifer now argues that given this reference, "[t]he jury could now assume or infer [that he] was involved with or associated with persons involved in robbery and shootings thereby making him a general bad actor." Aplt. Opening Br. at 21.

We discussed this issue in detail in connection with Mr. Hohn's direct appeal. In our decision in that case, we stated:

> [A]t trial, as the government was questioning a witness concerning the contents of a notebook found in her bedroom, the witness identified names in the notebook as "names of the people that were involved in the shootout in Kingdom City." R., Vol. 2 at 1305.

> The defendants immediately moved for a mistrial based on the witness's reference to the Missouri shooting. The district court determined that the government had inadvertently elicited the comment. As a curative matter, it called each of the jurors individually into the courtroom and informed each juror that the statement was being stricken from the record and that they should disregard it. The court also reminded the jurors that the names mentioned in the notebook were not those of the defendants. Finally, it asked each juror three questions: whether they could disregard the statement as instructed; whether they were still able to be fair and impartial to all parties in the case; and whether they were still able to decide the case based solely on the evidence admitted at trial and the court's instructions. Each juror answered all three questions affirmatively. The district court then denied the motion for mistrial.

10

We review the district court's denial of the motion for mistrial for an abuse of discretion. *United States v. Morgan*, 748 F.3d 1024, 1039 (10th Cir.), *cert. denied*, —— U.S. ——, 135 S.Ct. 298, 190 L.Ed.2d 217 (2014). Where inadmissible evidence is admitted, "a cautionary instruction is ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error." *Id.* (internal quotation marks omitted). Here, the shooting reference was unintentionally elicited, and the district court very carefully instructed and questioned each juror about the reference, satisfying itself that "the character of the testimony [was not] such that it [would] create so strong an impression on the minds of the jurors that they [would] be unable to disregard it in their consideration of the case, although admonished to do so." *Id.* at 1040. Denial of the motion for a mistrial was therefore not an abuse of discretion.

*Hohn*, 606 F. App'x at 907-08.

The same reasoning applies here. The district court not only struck the offending testimony and gave the jurors a cautionary instruction, it took the extraordinary step of questioning each juror individually concerning the inadvertently elicited testimony to insure that it did not unduly prejudice the defendants. For the same reasons stated in our previous decision, the district court did not abuse its discretion in denying Mr. Redifer's motion for a mistrial based on the reference to the Kingdom City shooting.

### B. The Garnett, KS, Arrest

Mr. Redifer sought to exclude testimony about his arrest in Garnett, Kansas, which resulted in his conviction for fleeing and eluding an officer and for various other minor offenses. The district court denied his motion for an order in limine as moot, because the government promised not to introduce evidence about the arrest during its case-in-chief.

11

At trial, however, Mr. Quick was asked about an instance when he picked up Mr. Redifer's truck after Mr. Redifer was arrested at the storage unit. The government asked Mr. Quick, "And were there any other times that you had possession of his truck?" R., Vol. 2 at 2353. He answered, "When he got arrested in Johnson County, *and then when he got arrested in Garnett*, both times. . . ." *Id.* at 2353-54 (emphasis added). Mr. Redifer moved for a mistrial, which the district court denied. We review the denial of a mistrial for an abuse of discretion. *See United States v. Farmer*, 770 F.3d 1363, 1370 (10th Cir. 2014).

The district court did not abuse its discretion in denying the mistrial. The remark was only incidental, and the underlying evidence was relevant to show the close relationship between Mr. Quick and Mr. Redifer, illustrated by the fact that Mr. Quick retrieved Mr. Redifer's truck three times when Mr. Redifer was arrested. Mr. Redifer complains that the comment allowed the jury to infer that he was "in and out of jail." Aplt. Opening Br. at 21. But this was clear from other evidence that was admitted at trial.

## V. Denial of Requested Jury Instructions

Mr. Redifer complains that four requested instructions were denied. "We review de novo whether the jury instructions given were adequate," and the denial of particular defense instructions for an abuse of discretion. *United States v. Gallant*, 537 F.3d 1202, 1233 (10th Cir. 2008) (internal quotation marks omitted). We uphold the denial of the requested instructions.

12

Mr. Redifer's proposed instruction No. 3 would have stated that a simple agreement to pool money and buy drugs is insufficient to establish a conspiracy, even where each buyer intends to resell methamphetamine. This instruction also listed factors that could be used to distinguish a joint buyer relationship from a conspiracy. The substance of this instruction was adequately covered by the Tenth Circuit Pattern Jury Instruction on conspiracy charges. In addition, the proposed instruction contained an inaccurate statement of Tenth Circuit law. In this circuit the buyer-seller rule (that a mere buyer-seller relationship does not establish a conspiracy) does not apply to defendants who plan to resell drugs for a profit. *See, e.g.*, *United States v. Wright*, 506 F.3d 1293, 1299 (10th Cir. 2007) ("[T]he purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy." (internal quotation marks omitted)).

Proposed instruction No. 4 would have instructed the jury concerning various issues involving proof of a conspiracy. We previously upheld the denial of this instruction in *Hohn*, 606 F. App'x at 910.

Proposed instruction No. 7 dealt with Rule 404(b) evidence. The district court found that its existing Rule 404(b) instruction "is an accurate reflection of the law, and is better left more generic than specific so as not to highlight any particular evidence admitted in the case." R., Vol. 2 at 2431. In addition, in view of the

13

overwhelming evidence against him at trial, Mr. Redifer fails to show that he was prejudiced by the denial of this requested instruction.

Mr. Redifer also requested an instruction that would have told the jury that a person cannot conspire with a law enforcement officer. His counsel expressed concern about evidence of controlled buys made by Ms. Rockers from law enforcement agents. The district court denied this instruction because "Tracy Rockers cannot conspire solely with law enforcement in regards to this evidence, but the purchases that were made can still be considered as part of the scope of the alleged conspiracy." *Id.* at 2435. In view of the evidence of a conspiracy involving non-government agents, any error in failing to give the requested instruction was harmless. *See United States v. Delgado*, 672 F.3d 320, 341-42 (5th Cir. 2012) (en banc) ("Where the evidence clearly establishes that the defendant conspired with non-governmental participants, the mere fact a government agent was also involved in the scheme does not necessitate [an] instruction [that an agreement with a government agent cannot be the basis for a conspiracy conviction].").

## VI. Admission of Co-Conspirator Statements

Mr. Redifer complains that he was denied a fair trial in connection with the admission of hearsay statements by his co-conspirators. Federal Rule of Evidence 801(d)(2)(E) provides that "[a] statement . . . is not hearsay" if it is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." "For a statement to be admissible under Fed. R. Evid. 801(d)(2)(E), the District Court must first find the following elements by a

14

preponderance of the evidence: (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statements were made in the course of and in furtherance of the conspiracy." *United States v. Hall*, 473 F.3d 1295, 1302-03 (10th Cir. 2007) (internal quotation marks omitted). These findings are generally made after a so-called *James* hearing,[4] held outside the presence of a jury.

The district court held a *James* hearing, at which it heard testimony from the government's case agent, Deputy Williams; concluded that the necessary factors had been established for admission of the co-conspirators' statements; and stated that if Mr. Redifer believed that any additional statements the government sought to introduce at trial were not in furtherance of the conspiracy, he could "bring those up at trial." R., Vol. 2 at 301. Mr. Redifer argues that the hearsay statements the government sought to introduce were made during post-conviction interviews with the co-conspirators, and were therefore not made "in the course of and in furtherance of the conspiracy," *Hall*, 473 F.3d at 1303. During the *James* hearing, however, Deputy Williams stated that he interviewed the co-conspirators, and that during those interviews, they provided information about conversations they had during the course of the conspiracy. R., Vol. 2 at 243. He also presented information concerning his investigation to establish the existence of the conspiracy.

In addition, Mr. Redifer fails to identify any specific co-conspirator statements admitted during trial that were hearsay and not made in the course of or in

---

[4] *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979).

15

furtherance of the conspiracy. Finally, Mr. Redifer fails to show that his rights were violated by the government's choice to present its evidence at the *James* hearing through the testimony of Deputy Williams. *See United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995) ("[A]t a *James* hearing, the district court has the discretion to consider any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial.").

## VII. Government's Alleged Use of Perjured Testimony

Mr. Redifer argues that the co-conspirator witnesses against him committed perjury. He contends that the government offered their testimony knowing that it was false. He asks that this issue be reviewed for plain error due to the lack of objection at trial, and the government also asserts that it is governed by the plain-error standard. When reviewing an issue for plain error, we ask whether "(1) there was error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Kalu*, 791 F.3d 1194, 1201 (10th Cir. 2015) (internal quotation marks omitted).

To establish this claim, Mr. Redifer must show that "(1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). The government argues that Mr. Redifer has failed to allege facts showing that it knowingly offered perjured testimony and that any inconsistencies in the

16

witnesses' testimony are immaterial to the jury's verdict. Having carefully reviewed Mr. Redifer's arguments and the record, we conclude that he has failed to show that any of the alleged instances he identifies rise to the level of knowingly offered perjured testimony. Mr. Redifer fails to show error, much less plain error, in the admission of the challenged testimony.

## VIII. Admission of Firearm

Mr. Redifer argues that the district court plainly erred by improperly admitting into evidence Exhibit No. 74, a pistol that Mr. Randall testified had been stolen from Mr. Redifer. The pistol was recovered from Mr. Quick's mother after Mr. Quick's arrest. The pistol was relevant because it appeared to be the same firearm that Mr. Redifer was holding in the December 17, 2010, photograph of himself and his co-conspirators. Moreover, in light of the other evidence of Mr. Redifer's participation in the conspiracy, he fails to show how introduction of the pistol seriously affected the fairness, integrity or public reputation of the judicial proceedings. Admission of the pistol was therefore not plainly erroneous.

## IX. "Adequate Court Facilities" Claim

Prior to trial, Mr. Redifer filed a motion to be provided a separate counsel table from his co-defendant, Mr. Hohn. He argued he would "be prejudiced by being forced to sit in close proximity to an alleged co-conspirator throughout the trial," because this would "increase[] the probability the alleged bad acts of the alleged co-conspirator will be attributed to Mr. Redifer by the jury," and might cause the jury to view Mr. Redifer and his co-defendant as a "group." *Motion of Defendant Michael*

17

*C. Redifer for Adequate Court Facilities and Memorandum In Support Thereof* dated

05/04/2013, R., Vol. 1, docket number 276, at 1. The district court denied the

motion, stating that it did

> not believe that [Mr. Redifer] will be prejudiced by sitting at the same table
> as his co-defendant. There are legitimate [spatial] as well as
> security-related and as well technological reasons the courtroom is set up
> the way it is, and the court would find this case does not present any special
> circumstances such that would require reevaluating that set-up. In addition,
> the court will instruct the jury to consider the innocence and guilt of each
> defendant separately.

R., Vol. 2 at 302-03.

Mr. Redifer has failed to show that being seated at a table with his

co-defendant posed "an unacceptable risk . . . of impermissible factors coming into

play" in the jury's determination of his personal guilt or innocence. *Holbrook v.*

*Flynn*, 475 U.S. 560, 570 (1986) (internal quotation marks omitted). In addition, the

district court instructed the jury that the defendants were charged separately and that

the jury must consider the innocence and guilt of each defendant separately. The

district court did not abuse its discretion in denying Mr. Redifer's motion to sit at a

separate table from his co-defendant.[5]

---

[5] Mr. Redifer argues that the failure to seat him separately from Mr. Hohn prejudiced him because there was insufficient evidence to convict him at trial; and that he was convicted solely based on prior bad acts, perjured testimony by the government's witnesses, and guilt by association. For the reasons we have already stated, his sufficiency-of-the-evidence challenge fails, and he fails to establish prejudice.

**X. Prosecutor's Alleged Comments on Mr. Redifer's Silence**

Mr. Redifer asserts that the prosecutor made improper comments infringing on his right to remain silent. As the government points out, *see* Aplee. Br. at 66, although Mr. Redifer cites dozens of pages from the trial transcript in his pro se supplemental brief, the only pertinent instance he identifies involves a comment made during the government's closing argument. During closing, the prosecutor stated, "Steven Hohn and Michael Redifer have argued *through cross-examination of witnesses, through opening statements* that we didn't do anything wrong. We are not guilty." R., Vol. 2 at 2447 (emphasis added). Mr. Redifer's counsel objected and moved for a mistrial, contending that the government had "commented on the defendants' right to remain silent by indicating that the defendants are arguing [their innocence] through closing." *Id.* at 2448. The district court denied the motion, reasoning that it had instructed the jury that statements of counsel were not evidence and that the defendants had pleaded not guilty. It then instructed the jury once again that statements of counsel were not evidence. Even if the challenged statement could be viewed as a comment on Mr. Redifer's failure to testify, it was not so prejudicial as to deprive him of his Sixth Amendment right to a fair trial. The district court did not abuse its discretion in denying the requested mistrial.

**XI. Post-Verdict Questioning of Jurors**

Mr. Redifer complains that after the verdict was reached, the district court improperly permitted the prosecution to question jurors about witness credibility for

sentencing purposes. He claims this violates Fed. R. Evid. 606(b)(1), which provides:

> **(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Here, the government's alleged inquiries likely did not fall within Rule 606(b)(1), because there is no showing that they represented an inquiry into the *validity* of the jury's *verdict*. *See Warger v. Shauers*, 135 S. Ct. 521, 528 (2014) (stating Rule 606(b) applies "during a proceeding in which the verdict may be rendered invalid." (emphasis omitted)). But in any event, the record does not reflect that the district court ever permitted the government to question the jurors about the credibility of the witnesses at trial. The last mention of this issue on the record appears to be the district court's statement just before it adjourned the proceedings:

> With regards to the contact with the jury . . . every courtroom or every court possibly does it in a different manner. In the past, we – we don't allow the contact after a trial for different reasons. I'll take into consideration what you've said, and I'll let you know after I finish speaking with them.

R., Vol. 2 at 2518.

But there is no indication that the district court permitted inquiry of the jury "after . . . speaking with them." *Id.* Mr. Redifer thus fails to show record support for his argument.

20

## XII. Cumulative Error

Mr. Redifer's counseled brief includes a perfunctory cumulative error argument. After stating the standard for cumulative error, he argues: "Based upon the aforementioned accumulation of errors committed in this case, Mr. Redifer is entitled to a reversal of his conviction." Aplt. Opening Br. at 25. The purpose of cumulative error analysis is to address whether the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Harlow*, 444 F.3d 1255, 1269 (10th Cir. 2006) (internal quotation marks omitted). We have held that Mr. Redifer failed to establish prejudice in connection with his claim of a variance from the indictment, and that the failure to give his requested instruction concerning conspiracy with a law enforcement officer was at most harmless error. Considering these two alleged errors in the aggregate with any other potential trial errors we have mentioned that were individually harmless, we conclude he failed to show that the errors alleged affected his substantial rights. In light of the evidence against Mr. Redifer presented at trial, the alleged cumulative errors were harmless beyond a reasonable doubt. *See United States v. Battles*, 745 F.3d 436, 462 (10th Cir. 2014) (discussing cumulative error standard). Therefore, his cumulative-error argument fails.

## ALLEGED SENTENCING ERRORS

The district court sentenced Mr. Redifer within the advisory Sentencing Guideline range calculated by the Probation Office. The Guideline range was based

on a total offense level of 42 and a criminal history score of II, yielding an advisory Guideline range of 360 months to life. Mr. Redifer brings several challenges to the calculation of his offense level. "[W]e review the district court's legal conclusions under the Guidelines de novo and its findings of fact for clear error, giving great deference to the district court's application of the Guidelines to the facts." *United States v. Evans*, 782 F.3d 1115, 1117 (10th Cir. 2015).

**XIII. Four-Level Guideline Increase for Conduct Involving Greg Price**

The presentence report (PSR) recommended two enhancements in Mr. Redifer's base offense level based on his involvement in uncharged conduct that led to the death of Greg Price, a drug user who died at a trailer home owned by Mr. Redifer's co-conspirators. First, it recommended a two-level increase for Mr. Redifer's use of violence and threats of violence against Mr. Price in an effort to collect on drug debts. *See* U.S.S.G. Manual § 2D1.1(b)(2) (2012) ("If the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by **2** levels."). Second, it recommended a two-level enhancement for physically restraining Mr. Price during the course of the offense. *See id.* § 3A1.3 ("If a victim was physically restrained in the course of the offense, increase by **2** levels."). The district court heard testimony concerning Mr. Price's death, ruled that the enhancements were appropriate, and incorporated them into its Guideline calculation.

## A. Standard of Proof

Ordinarily, sentencing enhancements are determined by a preponderance of the evidence. *See United States v. O'Brien*, 560 U.S. 218, 224 (2010). But Mr. Redifer argues that because of the disproportionate effect on his sentence, the two enhancements related to Mr. Price's death required an extraordinary standard of proof and should have been found by "clear and convincing" evidence.

The Supreme Court addressed the "enhanced level of proof" issue in *United States v. Watts*, 519 U.S. 148 (1997), "acknowledg[ing] a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence," *id.* at 156. The Court found it unnecessary to reach the issue, because the cases before it did not present such extreme or exceptional circumstances. *Id.* at 156-57; *see also McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (upholding use of the preponderance standard where the petitioner did not allege that the sentencing enhancement was "a tail which wags the dog of the substantive offense"), *overruled on other grounds*, *Alleyne v. United States*, 133 S. Ct. 2151, 2157 (2013); *Kinder v. United States*, 504 U.S. 946, 948 (1992) (White, J., dissenting from denial of certiorari) (acknowledging circuit split concerning whether "a clear-and-convincing-evidence standard is appropriate when the relevant conduct offered at sentencing would dramatically increase the sentence").

Although we have left open the possibility that extraordinary circumstances might justify the use of a more demanding standard at sentencing than a

23

preponderance of the evidence, we have never applied such an enhanced standard of proof. *See, e.g.*, *United States v. Olsen*, 519 F.3d 1096, 1105 (10th Cir. 2008) ("[O]ur circuit has never adopted the clear and convincing standard in so-called disproportionate impact cases," but "we have reserved the question of whether, in some extraordinary or dramatic case, due process might require a higher standard of proof"); *United States v. Smith*, 208 F.3d 1187, 1189 (10th Cir. 2000) (assuming "that a heightened burden of proof might be appropriate in cases of extraordinary upward adjustments in sentences," but finding no extraordinary circumstances justifying such a standard under circumstances of case); *United States v. Washington*, 11 F.3d 1510, 1516 (10th Cir. 1993) (recognizing "the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," but applying preponderance standard to drug-quantity issue). *But see United States v. Constantine*, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001) (stating that binding precedent forecloses any argument for higher standard for burden of proof in this circuit); *United States v. Valdez*, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000) (same).

Mr. Redifer fails to show that the circumstances of his case were so extraordinary that the district court should have applied a heightened standard of proof. Although the conduct that resulted in the enhancements led to the death of the victim, the enhancements themselves were not murder-based. The district court did not err in applying a preponderance standard to the enhancements relating to Greg Price.

24

## B. Sufficiency of the Evidence

Three witnesses—co-conspirators Michael Quick and Tracy Rockers, and detective Perry Williams—testified at Mr. Redifer's sentencing hearing about the events surrounding Mr. Price's death. Although there were some discrepancies in the testimony concerning Mr. Redifer's role in the events, the motivation for Mr. Redifer's conduct, and the precise cause of death, the district court sufficiently resolved the conflicts and made appropriate findings using the preponderance standard.

Specifically, with regard to use of violence in an effort to collect on drug debts, the district court found that "the Greg Price incident was in fact related to collection of drug debt," and that violence or a credible threat of violence was used. R., Vol. 2 at 2769. It noted that

> Michael Quick and Tracy Rockers both testified credibly that [Mr. Redifer], Michael Quick and Kerry Randall made credible threats to use violence by taking Mr. Price to the farm. Tracy Rockers also testified that defendant contacted Kerry Randall as somewhat of a scare tactic to get Mr. Price to explain about where the money was. Tracy Rockers also testified that defendant actually used violence by grabbing Mr. Price by the arms to force him out the door. During this incident, defendant and Kerry Randall shoved Mr. Price, and Mr. Price fell against the door.

*Id.*

The district court also found the "use of restraint" enhancement appropriate. It stated that it

> heard evidence that defendant, Michael Quick, Tracy Rockers, and later Kerry Randall threatened Greg Price, and made it clear to him that he was not free to leave the trailer. They used guns for intimidation. In the Tenth Circuit, using guns to keep someone from moving is sufficient for a Section

25

3 A 1.3 enhancement even if defendant does not physically touch the victim. . . . But in this situation, the defendant and Kerry Randall took the physical restraint even further and did touch Mr. Price. Miss Rockers credibly testified that they both grabbed Mr. Price's arms and physically took him to the door. As the court has [already] stated, the evidence about the Greg Price incident is credible, and giving an enhancement for physical restraint and use of violence is not double-counting. They are independent considerations, as the court previously held. The court, again, finds that the restraint occurred in relation to collection of a drug debt.

*Id.* at 2771.

The district court's legal conclusions were proper and its findings of fact were not clearly erroneous. Although the witnesses disagreed on some points, for essentially the reasons the district court expressed, there was sufficient evidence to justify the sentencing Guideline enhancements. We therefore affirm the Guideline enhancements related to Greg Price's death.

### XIV. Two-Level Enhancement for Possessing a Dangerous Weapon

The district court also enhanced Mr. Redifer's base offense level two levels for possession of a dangerous weapon in connection with a drug offense. *See* U.S.S.G. § 2D1.1(b)(1). It noted that "on more than one occasion, [Mr. Redifer] possessed a firearm during commission of the offense, including the incident in which he threatened Greg Price partly for non-payment of drug debts." R., Vol. 2 at 2768.

Mr. Redifer argues that there was insufficient evidence to show a connection between the firearms he possessed and the alleged drug conspiracy. The enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *See* § 2D1.1 app. n. 11(A). The government must prove only that the gun "was present or possessed

26

either during the charged offense or during other drug trafficking activity that was part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Shippley*, 690 F.3d 1192, 1199 (10th Cir. 2012) (internal quotation marks omitted). "Once the government proves that much, the burden shifts to the defendant to show that it is clearly improbable that the weapon was connected with the offense." *Id.* (internal quotation marks omitted).

The government presented evidence that Mr. Redifer possessed a pistol in connection with threatening Greg Price to collect a drug debt from Mr. Price. The enhancement was appropriately applied.

### XV. Two-Level Enhancement for Imported Methamphetamine

The district court enhanced Mr. Redifer's base offense level by two levels because "the offense involved the importation of . . . methamphetamine or the manufacture of . . . methamphetamine from listed chemicals that the defendant knew were imported unlawfully." U.S.S.G. § 2D1.1(b)(5). He argues this enhancement was inappropriate because the government did not establish, by a preponderance of the evidence, that (1) the methamphetamine was imported and (2) that he knew it was imported. He also contends that the enhancement did not apply because he was not convicted of importation or manufacturing of methamphetamine. We addressed the first of these issues in Mr. Hohn's case, and need not repeat our analysis here. The other two issues lack merit.

27

### A. Knowledge that Methamphetamine was Imported

This issue involves the correct interpretation of the phrase "that the defendant knew were imported unlawfully" in § 2D1.1(b)(5). Mr. Redifer contends this scienter requirement applies both to offenses involving importation of methamphetamine *and* to offenses involving the manufacture of methamphetamine from listed chemicals. The Fifth Circuit has held, however, that a defendant who possessed and distributed imported methamphetamine, even absent knowledge that he knew it was imported, is subject to the enhancement. *United States v. Serfass*, 684 F.3d 548, 550-52 (5th Cir. 2012). We need not resolve this issue, because regardless of the correct reading of the Guideline provision, we determine that the government proved by a preponderance of the evidence that Mr. Redifer knew the methamphetamine was imported.

### B. Whether Mr. Redifer's Crime Involved Importation

Mr. Redifer argues that "there is no basis for applying the importation enhancement because he was not charged with any importation or manufacturing offense." Aplt. Opening Br. at 35. He does not cite any authority favorable to this position, and well-reasoned authority appears to be to the contrary. *See, e.g.*, *United States v. Foulks*, 747 F.3d 914, 915 (5th Cir. 2014); *United States v. Biao Huang*, 687 F.3d 1197, 1206 (9th Cir. 2012) ("[A] defendant need not be personally involved in the importation of illegal drugs to receive an enhancement under § 2D1.1(b)(5); it is enough for the government to show that the drugs were imported."). We will

28

follow our sister circuits and conclude that it was sufficient for the government to show that the drugs were imported.[6]

## XVI.  Drug Quantity

### A.  PSR Calculations

In sentencing Mr. Redifer, the district court relied on the drug quantity calculation contained in the presentence report (PSR).  *See* R., Vol. 2 at 2767-68. The PSR assigned Mr. Redifer a base offense level of 34, based on an offense involving between 1.5 and 5 kilograms of methamphetamine.  *See* U.S.S.G. § 2D1.1(c)(3).  Mr. Redifer raises numerous evidentiary challenges to the PSR's drug quantity calculation.  He argues that (1) "[b]ecause the government alleged the conspiracy began in October, 2010, any drug quantities from September, 2010, are excluded from the PSR," Aplt. Opening Br. at 37; (2) personal-use quantities should not be included in the calculation; and (3) only the methamphetamine that Mr. Redifer distributed during three of the months involved—October 2010, January 2011, and May 2011—was sufficiently proved to count as relevant conduct for purposes of his offense level computation.

_____

[6] In his supplemental brief, Mr. Redifer argues that the evidence supporting this enhancement was hearsay.  District courts can rely on hearsay at sentencing, so long as the evidence is sufficiently reliable. *United States v. Caiba-Antele*, 705 F.3d 1162, 1165 (10th Cir. 2012).  Mr. Redifer fails to show that the evidence supporting the importation enhancement was unreliable.  He also argues that there was a lack of proof because "[t]he alleged [H]ispanic sources were not indicted, or even identified." Supp. Br. at 11-12.  They were in fact identified, as the Reynoso and Marquez brothers.  We note also that Jorge and Daniel Reynoso were indicted as conspirators in this case.

The district court reached the 1.5 kilogram threshold based on an estimate in the PSR that from September 2010 until June 2011, Mr. Redifer had received 1.5 ounces of methamphetamine per week from Mr. Quick:

> Based on information available to the Probation Office including investigative reports and interviews with co-defendants, Mr. Redifer was involved in the distribution of methamphetamine from at least September 2010 until June 2011[. T]he Indictment charges that the defendant was involved in the conspiracy, beginning in September 2010. According to [co-defendant Michael Quick's] estimates, he distributed at least 1.5 ounces of methamphetamine weekly during that time period, approximately 9 months (40 weeks). This equates to approximately 60 ounces (1.5 ounces x 40 weeks = 60 oz.). 60 ounces is approximately 1,701 grams (1.701 Kilograms methamphetamine).

R., Vol. 3 at 25 (emphasis omitted).[7]

This paragraph of the PSR incorrectly identified the commencement date for the conspiracy charged in the Second Superseding Indictment as September 2010 rather than October 2010. But in a footnote, the PSR corrected this error, and also further explained the basis for the figure of 1.5 ounces per week allegedly distributed from Mr. Quick to Mr. Redifer as part of the conspiracy, concluding that the 1.5 kilogram threshold would be met even if the time period in question began in October 2010:

> This estimate was determined based on various co-defendants' statements, *see* paragraphs 54, 55 and 64, of this report. Specifically, in his statements, Michael Quick indicated that he was providing meth to Mr. Redifer in ½ ounces [sic] quantities, several times a week and he estimated that

---

[7] According to a source not reasonably subject to dispute, one ounce is equal to 28.3495 grams. *See* https://www.google.com/?gws_rd=ssl#q=ounces+to+grams (visited October 27, 2015). If 1.5 ounces per week are attributable to Mr. Redifer, this equals 42.5242 grams per week.

Mr. Redifer was provided with a "minimum" of 1.5 ounces a week, the conspiracy charges from October 2010. The defendant believes that the defendants should not be held accountable to any activity prior to the dates charged in the Indictment. Using the defendant's start date, and maintaining an estimate of 1.5 ounces weekly, this calculates to 1.53 Kilograms from October 2010 to June 2011. However, the U.S. Probation Office is of the opinion that the defendant's dealings with Michael Quick starting in September 2010, were part of the instant offense and included as relevant conduct pursuant to USSG §1B1.3. Based on these statements, the amount of methamphetamine deemed attributable to the defendant in this report is based on a conservative estimate, calculated to the benefit of the defendant.

*Id.* at 25, n.3.[8]

The footnote in the PSR cited and relied upon paragraphs 54, 55, and 64 of the report. These paragraphs read as follows:

54. Tracy ROCKERS . . . . said she was introduced to Mike QUICK in approximately October of 2010. ROCKERS stated QUICK was a source of supply for methamphetamine to a subject she knew from the Garnett, Kansas area named Jerry MACAFEE. . . . REDIFER would . . . sell . . . ½ ounce of methamphetamine to ROCKERS and MACAFEE. After a period of time, ROCKERS began dealing with QUICK and REDIFER without MACAFEE. . . . ROCKERS called REDIFER and [met] him in Lawrence, Kansas to pick up ½ ounce quantities of methamphetamine, which he

_____

[8] If the relevant time frame is September 2010 until June 1, 2011, this is 273 days, or 39 weeks. Thirty-nine weeks times 42.5242 grams per week yields 1658 grams, above the 1.5 kilogram threshold. (The PSR's figure, based on 40 weeks, is 1701 grams).

On the other hand, if the time period for drug quantity calculation began on October 1, 2010—the approximate beginning date of the conspiracy as pled in the indictment—the relevant period would be 243 days, or 34.7 weeks. 34.7 weeks times 42.5242 grams per week yields 1476 grams, which would be just *under* the 1.5 kilogram threshold. But the PSR's figure for this period is 1.53 kilograms, which likely means that the Probation Office used a 36-week figure. Thirty-six weeks times 42.5242 grams per week yields 1530.87 grams, a result very close to the 1.53 kilograms in the PSR's alternative figure for October 2010 to June 2011. This figure is still over the 1.5 kilogram threshold, but just barely.

fronted to her. ROCKERS was able to sell the ½ ounce in a 3 hour time period. ROCKERS then re-contacted REDIFER to get another ½ ounce to sell. ROCKERS received the second ½ ounce from QUICK at his residence, where REDIFER bragged to QUICK about how fast ROCKERS sold the first ½ ounce. ROCKERS was provided the second ½ ounce from QUICK and REDIFER. ROCKERS was also able to sell the second ½ ounce quantity in a short period of time. ROCKERS began her dealings with REDIFER in late November or early December of 2010. ROCKERS got approximately 1 ounce of methamphetamine "every couple days" to sell.

*Id.* at 21.

55. ROCKERS began dealing directly with QUICK in late January of 2011. ROCKERS knew REDIFER's source of supply was QUICK, so she began dealing directly with him, so as to cut out the middle man. QUICK had a better price for the methamphetamine. ROCKERS was getting ½ ounce quantities from REDIFER for $950.00 and QUICK was selling 1 ounce quantities for $1,600.00. ROCKERS began to accompany QUICK to his source of supply located in Desoto, Kansas, where they would get 1-2 ounce quantities of methamphetamine from two Mexican brothers, every 2 or 3 days, for approximately 5 months on a consistent basis from the brother she knew as "LADIO." Depending on her business at the time, ROCKERS might retain 1 ounce of methamphetamine while, according QUICK would retain an additional 1 ounce, that he would split with Steven HOHN, who was living with QUICK in Eudora, Kansas.

*Id.*

64. Michael QUICK . . . . stated that in September 2010, he started fronting ½ ounce quantities of methamphetamine several times a week to Mr. Redifer. He stated that he sold to Mr. Redifer a minimum of one a and half ounces every week until about November 2010, when he quit dealing directly to Mr. Redifer because of a disagreement over customers. Starting in November, Mr. Redifer began getting his methamphetamine from Steven Hohn. According to Mr. Quick, he was still supplying Mr. Redifer during this time because Hohn was getting methamphetamine from Mr. Quick and supplying it to Mr. Redifer during this time. Mr. Redifer and Mr. Quick worked out their differences and Mr. Quick resumed direct dealings with Mr. Redifer.

*Id.* at 24.

**B. Mr. Redifer's Challenges to the PSR's Drug Quantity Figure**

Using his own calculations, Mr. Redifer arrives at a figure totaling 510.29 grams, only about a third of the PSR's figure. The 510-gram figure would put his base offense level at 32 instead of 34. Thus, his total offense level would be 40 rather than 42, resulting in a Guideline range of 324 months to 405 months, rather than 360 months to life. *See* Sentencing Table, U.S.S.G. Manual, Ch. 5, pt. A (2012).

**C. Is There Sufficient Evidence to Support the Drug Quantity Figure in the PSR?**

Under U.S.S.G. § 1B1.3, a defendant's base offense level is based on his "relevant conduct." *United States v. Damato*, 672 F.3d 832, 839 (10th Cir. 2012) (internal quotation marks omitted). In cases such as a drug conspiracy where a quantity distributed establishes the base offense level, this includes "acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Both the PSR and the district court recognized that in addition to the methamphetamine involved with Mr. Redifer's own drug activity, he could be held responsible for the reasonably foreseeable drug activity of his co-conspirators. But the specific drug quantity attributed to him was predicated on his personal drug activity rather than on reasonably foreseeable activity by his co-conspirators, and the PSR did not attempt to quantify their activity in order to attribute it to Mr. Redifer. Therefore, in order to justify the computation used in the PSR, it was necessary that there be evidence that

33

Mr. Redifer distributed or possessed with intent to distribute at least 1.5 ounces weekly from September 2010 to June 2011.

We begin by observing that Mr. Redifer's possession or distribution of methamphetamine in September 2010, though it predates the conspiracy charged in the indictment, meets every requirement for an act that was part of the same course of conduct as those alleged as part of the conspiracy. It was similar to the distribution during the conspiracy, involved a repetition of conduct alleged as part of the conspiracy, and immediately pre-dated the time period of the conspiracy. Therefore, the district court properly used the PSR's relevant conduct estimate based on quantities distributed beginning in September 2010. *See Shippley*, 690 F.3d at 1200 (stating government can consider uncharged relevant conduct arising prior to charged conspiracy).

Mr. Quick testified that during September and October 2010 he provided Mr. Redifer with a minimum of one and one-half ounces of meth each week. In November 2010, Mr. Redifer and Mr. Quick had a falling-out, and Mr. Hohn began supplying Mr. Redifer, presumably with the same quantities. Then, at some point, Mr. Quick and Mr. Redifer patched up their differences, and Mr. Quick began supplying Mr. Redifer again.

But this is where the factual recitation in the PSR concerning Mr. Redifer's dealings with Mr. Quick ends.[9] While the facts recited are sufficient to justify a

---

[9] The PSR does report that Mr. Quick later bonded Mr. Redifer out of jail after Mr. Redifer's arrest in June 2011. R., Vol. 3 at 24, ¶ 65. Mr. Quick stated during a

conclusion that Mr. Redifer received one and one-half ounces of meth per week during September, October, and November 2010, there is no specific evidence that Mr. Redifer continued to receive that quantity of meth from Mr. Quick after that point.

The government attempts to fill in this blank with its statement that "[Mr.] Quick's drug ledger, admitted at trial . . . reflected that [Mr. Redifer] *continued to obtain* distribution-quantity amounts of methamphetamine from Quick into late May 2011." Aplee. Br. at 52 (emphasis added). The implication is that Mr. Quick supplied distribution quantities of meth to Mr. Redifer *throughout* the time period of December 2010 through May 2011. If that were true, it could be sufficient to satisfy the preponderance standard. But that is not what Mr. Quick's ledger said, and it was not what he testified to in the testimony cited by the government.

At trial, the government introduced a notebook kept by Mr. Quick to record his drug transactions. The notebook contained a reference to Mr. Redifer obtaining 20 or 24 grams of meth from Mr. Quick, for which he paid $650. R., Vol. 2 at 2348. There was also reference to an old debt that Mr. Redifer owed to Mr. Quick. In addition, it stated that he received a half ounce, owed $850, and paid $900. There was also a reference to a transaction on May 13, when "Mike [Redifer] got a half ounce, 850, paid and then got 12, I don't know what that 12.72, I don't know what that is, then

_____

proffer interview on March 30, 2012, that Mr. Redifer owed him $2,500 for meth and bond money, but the PSR does not attempt to identify how much was owed for meth as opposed to bond money, what quantity of methamphetamine was involved, or when the drug debt was incurred.

35

paid 725, then got a seven, owed 440, paid 80, and paid 20, then 10 for something."

*Id.* at 2349. Mr. Quick described additional transactions from May 2011 as follows:

> May 21st, he got – earlier today, he got an ounce, owed 16, paid 14, owed 200, got a seven, owed 600, paid 300, got another seven, owed 700, paid 400, owed 300, paid 1-- 180, owes 120, got another ounce, owed 16 plus 120, owed 1720, and then paid 1200, 520 owed, got a half ounce, owed 1320, paid 400, owes 125 plus 125, 400 plus 125, owes 795, paid 550, paid 150, then 95 owed.
>
> . . . .
>
> Then got an ounce for 16. So, that plus 95, paid 700, owed 995, paid 10, owes 895.

*Id.* at 2351.

Although this testimony described prolific drug activity in or around May 2011 by Mr. Redifer, involving perhaps several ounces of methamphetamine, it does not fill the evidentiary gap in his drug activities between December 2010 and mid-May 2011.

In its brief, the government also cites the testimony of Ms. Rockers. It claims that she testified at trial that "in early 2011, she obtained a half ounce of methamphetamine every couple of days from the defendant on credit, which she sold to her customers in Garnett." Aplee. Br. at 52. From this, and her statement that she obtained methamphetamine from Mr. Redifer 15 to 25 times, the government concludes that she obtained "between 210 and 350 grams of methamphetamine" total from Mr. Redifer. *Id.* The government appears to be assuming that Ms. Rockers obtained one-half ounce (about 14.17 grams) each time she dealt with Mr. Redifer. (14.17 times 15 = 213; 14.17 times 25 = 354). But even if she dealt with him 15

36

times, or even 25 times, receiving a half-ounce each time, this would hardly cover the one-and-one half ounces a week for four months that the government needs to fill in between the substantiated dealings involving Mr. Redifer and Mr. Quick.

In sum, the evidence cited in the PSR does not support the conclusion that Mr. Redifer was involved with one and one-half ounces per week from October 2010 to June 2011. The evidence thus does not support the drug quantities attributed to Mr. Redifer in calculating his sentence. We take no position on whether the evidence adduced at trial and at sentencing, if properly considered, is sufficient to justify the sentence the district court awarded. We determine only that the evidence cited does not support the methodology adopted in the PSR and relied upon by the district court.

In its response brief, the government falls back on reasonably foreseeable conduct not specifically relied on in the PSR. It argues that "[Mr. Redifer], Quick, Hohn, Rockers and Randall had a close and trusting relationship, that [Mr. Redifer] often stayed at Quick's residence . . . and that [Mr. Redifer] was often present when Quick provided methamphetamine to others for resale." Aplee. Br. at 53. It notes that Mr. Quick "admitted to selling methamphetamine at a conservative average of 3 ounces . . . every 3 days for three years." *Id.* (internal quotation marks omitted). But the government fails to establish the necessary elements of relevant conduct that would tie Mr. Redifer to the quantities distributed by Mr. Quick. More importantly, it fails to show that the district court made any such findings, and we decline to do so in the first instance. Such sentencing findings are best made by the district court, applying the appropriate criteria. *See, e.g., United States v. Jim*, 786 F.3d 802, 816

37

(10th Cir. 2015) (remanding, after clarification of legal error at sentencing, for district court's consideration of proper legal standard in the first instance).  We conclude that a remand for resentencing, with further findings concerning the appropriate drug quantity to be attributed to Mr. Redifer, is the appropriate course of action here.  *See United States v. Kristl*, 437 F.3d 1050, 1054-55 (10th Cir. 2006) (when district court errs in applying the Guidelines, remand is appropriate unless the error is harmless).

### XVII.  Mr. Redifer's Request for a Variance

Finally, Mr. Redifer argues that the district court erred in denying his request for a downward variance, because (1) his "conduct was less cul[p]able and in a much smaller scale than others involved"; (2) his "criminal history was substantially less than the others"; and (3) his "sentence should align with that of [Mr.] Quick who received a Rule 11(c)(1)(c) 20-year sentence."  Aplt. Opening Br. at 41.  Mr. Quick, of course, pleaded guilty and was therefore not similarly situated to Mr. Redifer.  But the district court may wish to reconsider Mr. Redifer's request for a variance after the redetermination of drug quantities we have ordered on remand.

Mr. Redifer also makes a conclusory argument that "the Trial Court failed to properly consider [18 U.S.C. § 3553(a)] factors and further imposed a sentence that was disproportionate to those individual factors for Mr. Redifer."  *Id.*  This one-sentence argument, unaccompanied by any details or discussion of the relevant sentencing factors, does not show that the district court abused its discretion in sentencing Mr. Redifer.

38

**CONCLUSION**

We affirm Mr. Redifer's conviction but remand for resentencing as set forth

herein.  All remaining pending appellate motions are denied.

Entered for the Court


Carolyn B. McHugh
Circuit Judge